**IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF FLORIDA
JACKSONVILLE DIVISION**

BLUE CROSS AND BLUE SHIELD OF
FLORIDA, INC., and HEALTH OPTIONS,
INC.

                                          CASE NO.: 3:19-cv-_____

       Plaintiffs,

v.

DAVITA, INC. f/k/a DAVITA HEALTHCARE
PARTNERS INC.,

       Defendant.

_____

## COMPLAINT

Plaintiffs Blue Cross and Blue Shield of Florida, Inc. ("BCBSF") and Health Options,

Inc. ("HOI") (collectively referred to herein as "Florida Blue") file this Complaint against

Defendant DaVita, Inc.[1] ("DaVita") and further state and allege as follows.

## I.      NATURE OF THE ACTION

1.      DaVita has engaged, and continues to engage, in a deceptive and illegal

scheme, more specifically set forth below, whereby DaVita donations to a charitable

organization, the American Kidney Fund ("AKF"), are used to purchase commercial health

insurance coverage for DaVita patients with chronic kidney disease who in turn obtain

dialysis services from DaVita, which in turn bills insurance companies, such as Florida Blue,

for those services.

---

[1] Effective September 1, 2016, DaVita HealthCare Partners Inc. changed its name to DaVita
Inc.

2.      Through this scheme, DaVita has damaged Florida Blue to the tune of tens of millions of dollars over at least the past several years.

3.      As one of the country's largest for-profit providers of dialysis services for patients with end stage renal disease ("ESRD"), DaVita used its considerable resources to either steer patients who were eligible for Medicare and/or Medicaid into, or keep those patients enrolled in, Florida Blue commercial health insurance policies, contracts, and/or plans that the patients did not need or could not afford but that DaVita coveted and preferred, so that DaVita could get paid certain rates by Florida Blue for the dialysis services it rendered.

4.      Through its efforts, DaVita effectively paid unwitting patients millions of dollars to participate in the scheme—purchasing Florida Blue insurance for its patients and illegally waiving the patients' significant resultant cost-sharing responsibilities (like deductibles and coinsurance obligations) that attached to the dialysis services the patients received, yet leaving the patients responsible for cost-sharing for other areas of care.

5.      By paying patients' premiums and eliminating their cost-sharing obligations, DaVita effectively provided patients with free Florida Blue insurance coverage and free dialysis, all so DaVita could reap greater payments and profits from Florida Blue.

6.      DaVita's return on investment in the scheme is substantial. For example, in a single year, DaVita illegally invested $120 million—*i.e.*, by "donating" that money to AKF in contravention of applicable DHS regulations to pay for Medicaid patients it was treating to enroll in, or remain enrolled in, commercial health insurance policies, contracts, and/or plans—and

received $450 million in operating income from benefits payments for services it provided to those commercial patients.

7.      If those same patients had remained enrolled in government plans, DaVita would have received approximately $300 million *less* in reimbursements for providing the same services to those same patients.

8.      Most of DaVita's dialysis patients have or are eligible for Medicare and/or Medicaid insurance. This is because in 1972, Congress passed legislation authorizing the End Stage Renal Disease Program under Medicare, which today extends Medicare coverage to 90% of Americans who require dialysis services from companies like DaVita, regardless of age. Moreover, regardless of whether they qualify for Medicare, many patients with ESRD now qualify to receive health insurance through Medicaid, a healthcare program for families and individuals with low income and limited resources that was created by amendments to Title XIX of the Social Security Act, 42 U.S.C. § 1396, *et seq*. Medicare and Medicaid are often extremely favorable insurance plans for dialysis patients, because they provide free or otherwise affordable coverage of the patients' dialysis and other medical needs.

9.      For DaVita, the ready availability of Medicare and/or Medicaid coverage for most of its dialysis patients presents DaVita with a dilemma: accept the Medicare and Medicaid rates of $300 or less per dialysis session, reimbursement rates that substantially reduce DaVita's profits, or actively take steps to enroll those same dialysis patients in commercial health insurance policies, contracts, and/or plans that pay DaVita more for the same services.

10.     Commercial health insurance policies, contracts, and/or plans generally reimburse DaVita at rates that are far higher than the rates Medicare and/or Medicaid pay. Accordingly, DaVita prefers dialysis patients with commercial insurance, and, in fact, depends heavily on patients with commercial—not government—insurance for its profits.

11.     As DaVita has acknowledged in its SEC filings, the payments it receives "from commercial payors generate nearly all of [its] profits." DaVita 2017 Annual Report at 114. For DaVita to grow its revenues and continue to operate profitably, DaVita actively takes steps to steer patients away from enrolling in Medicare and Medicaid, while promoting and directing their enrollment into private insurance plans so it can provide dialysis services to as many commercially-insured patients as possible and increase its profits.

12.     But several barriers sit between DaVita and its ability to move its patients onto, or keep its patients enrolled in, the commercial insurance plans it prefers, and between its ability to earn massive profits from those patients' insurers. *First*, the patients themselves often do not need or want the commercial insurance plans DaVita would prefer them to have, which may not be in the patients' best interests. *Second*, even if the patients want to enroll in, or to remain enrolled in, commercial plans, they must pay the required premiums for those plans, which would be reduced or non-existent if the patients are enrolled in Medicare or Medicaid, rather than commercial insurance. *Third*, even after paying premiums, the patients would still need to pay their "out of pocket" expenses, such as deductibles, copayments, and coinsurance amounts that they would be required to pay under commercial plans, which again would be reduced or non-existent if the patients were to enroll in primary Medicare or

Medicaid. Unfortunately, DaVita's profit-driven incentives to induce its patients to enroll in, or stay enrolled in, commercial insurance plans often conflict with its patients' best interests.

13.     To overcome these barriers and inflate its profits, DaVita has orchestrated a multi-faceted scheme designed to aggressively pressure unwitting dialysis patients into enrolling in, or remaining enrolled in, commercial insurance plans offered by Florida Blue (and other insurance providers) while continuing to treat at DaVita clinics in order to get substantially higher payments from Florida Blue for those patients' dialysis treatments than it would have gotten had the patients been covered by Medicare or Medicaid. DaVita's elaborate scheme has consisted of the following components:

14.     *First*, DaVita has targeted its own Medicare and Medicaid-eligible patients in order to steer them to, or convince them to remain enrolled in, commercial insurance plans, including those offered by Florida Blue. DaVita has deployed several tactics to push patients into, or keep them enrolled in, the commercial plans it thought would pay the highest reimbursement rates, including directing its insurance counselors and social workers to:

- "Educate" patients that commercial insurance plans are actually in their best interests by providing patients with incomplete, inaccurate, and slanted information and propaganda-like materials about their insurance options and counseling them to enroll in certain commercial plans;

- Promise patients that if they enrolled in commercial insurance plans, they would not have to pay for the coverage (in the form of premiums) or their dialysis treatments (in the form of deductibles and coinsurance payments); and

- In many cases, actually enroll patients into the plans, including Florida Blue plans, that DaVita had hand selected.

DaVita's efforts to steer vulnerable patients into Florida Blue's commercial insurance plans have not been driven by concern for the patients' interests, but rather out of concern for its own bottom line.

15.    *Second*, to ensure its patients enrolled in, or remain enrolled in, commercial insurance plans, DaVita paid its patients' premiums. Because paying its own patients' premiums is prohibited by a host of laws, regulations, and other authorities, DaVita works closely with AKF—a registered 501(c)(3) organization—as a financial intermediary through which DaVita effectively paid its patients' premiums and to conceal the fact that DaVita is actually the entity paying the premiums.

16.    The DaVita-AKF relationship works, and has worked, as follows: DaVita makes substantial "charitable" "donations" to AKF that are carefully calibrated to cover the amounts in premiums DaVita patients would require for commercial insurance premiums. DaVita and AKF operate under an understanding that AKF will route (or allow DaVita's employees to route) the bulk of the "donations" back to DaVita's patients in amounts calculated to cover their premiums. By funneling money through AKF and back to its patients, DaVita essentially pays its patients to enroll in, or remain enrolled in, commercial insurance plans, including Florida Blue plans, that DaVita believes serves its financial interests and profit goals.

17.    *Third*, DaVita by way of pattern and practice routinely waived, eliminated, or otherwise failed to collect its Florida Blue members' deductible, copayment, and coinsurance

obligations. If the patients had maintained Medicare or Medicaid as their primary insurance, many of them would face little to no financial responsibility for any of their dialysis services, other medical treatments, prescription drugs, and services like transportation. Because commercial plans, including Florida Blue plans, generally have higher deductible, copayment, and coinsurance obligations, DaVita eliminates them on its end to ensure that patients will enroll in, or remain enrolled in Florida Blue's plans, and continue treating at DaVita's facilities.

18.     By ensuring that patients enrolled in Florida Blue's commercial plans do not have to bear the cost of their dialysis, DaVita keeps treating them at its facilities under conditions most financially beneficial to DaVita. Moreover, although *DaVita* agrees to waive—or to make no meaningful effort to collect—the patients' cost-sharing obligations, it cannot guarantee the patients' *other doctors, pharmacists, medical equipment suppliers, and service providers* will do the same. This means that, by steering patients into Florida Blue's plans, DaVita has caused its patients to incur additional financial burdens, which DaVita intentionally or negligently fails to disclose to patients when trying to convince them to enroll in, or remain enrolled in, commercial insurance plans.

19.     *Finally*, DaVita billed Florida Blue tens of millions of dollars for the dialysis services that DaVita rendered to the patients it targeted with its scheme. In billing Florida Blue, DaVita makes material misrepresentations and conceals, and fails to disclose, material facts, including the fact that it is paying the Florida Blue members' premiums and failing to collect their deductible, copayment, and coinsurance obligations—conduct designed to defeat

the cost-sharing features, benefit structure, and function of Florida Blue's commercial benefit plans.

20.     DaVita's conduct breaches contractual obligations the company took on when it entered an Ancillary Provider Agreement (the "Provider Agreement") with Florida Blue, most recently in 2014. That Agreement requires DaVita, among other things, to comply with laws that prohibit the exact types of abusive, deceptive, and fraudulent conduct DaVita has engaged in.

21.     Because of DaVita's unlawful, tortious, and unfair conduct, Florida Blue paid DaVita (and other providers) millions of dollars more than it would have paid had DaVita acted truthfully, lawfully, and properly. Simply put, DaVita constructed, implemented, and concealed a complex scheme that exploits its own patients and takes advantage of Florida Blue (including Florida Blue's other policyholders and members), all in pursuit of greater profits.

22.     Importantly, Florida Blue is not the only victim of DaVita's scheme. As described above, DaVita's conduct exposes patients to cost-sharing obligations (including those related to services received from other providers) that they sometimes cannot afford. And DaVita fails to tell patients that the premium payments they are receiving the benefit of through AKF will only remain available if they *stay on* dialysis, meaning that if they sought to cure their ESRD with a kidney transplant, they would lose their premium funding and, potentially, their commercial insurance plans.

23.     Florida Blue brings this lawsuit to protect all its policyholders and members from further illegal, deceptive, and injurious conduct by DaVita, to bring a stop to the conduct

DaVita has been using to defeat the material provisions of Florida Blue's commercial plans, and to recover the substantial damages it has incurred based on the actions described in this Complaint.

## II.   PARTIES

24.     Blue Cross and Blue Shield of Florida, Inc., a Florida health insurance company, was created in 1980, through the merger of two companies: one that started out as the Florida Hospital Services Corporation (the original name for Blue Cross of Florida, Inc.); and the other that started out as the Florida Medical Service Corporation (the original name for Blue Shield of Florida, Inc.). Following a corporate reorganization in 2014, Blue Cross and Blue Shield of Florida, Inc. d/b/a "Florida Blue" became a wholly-owned subsidiary of GuideWell Mutual Holding Corporation, a Florida not-for-profit corporation, as part of a mutual insurance company holding system including HOI, a licensed Florida Health Maintenance Organization (HMO). Including its predecessor entities, Florida Blue has offered health insurance plans in the state of Florida for at least 74 years. Florida Blue (in its current form) has continuously offered individual health insurance plans in Florida since at least 1980. With respect to its predecessor entities, the Florida Hospital Service Corporation sold its first individual hospital service contract in 1944; the Florida Medical Service Corporation sold its first individual medical service contract in 1946.

25.     Plaintiffs BCBSF and HOI offer and provide health coverage and benefits to insured members and plan participants through a variety of benefit plans and policies issued in the State of Florida. BCBSF and HOI are corporations organized under the laws of the State of Florida with their principal place of business located in Jacksonville, Florida. Both

companies operate under certificates of authority issued by the Florida Office of Insurance Regulation.

26.     Defendant DaVita is a nationwide provider of dialysis services, and is one of the country's two largest dialysis providers. DaVita is a Delaware corporation with its corporate headquarters located in Denver, Colorado.

27.     Various firms and individuals not made defendants in this Complaint, including the AKF, its executives, and employees, participated as co-conspirators with DaVita in the violations alleged in the demand, and performed acts in furtherance of DaVita's violations.

## III.     RIPENESS OF THIS DISPUTE

28.     Many aspects of DaVita's commercial relationship with Florida Blue are governed by, and subject to, the Provider Agreement between the parties effective January 1, 2014 (and amended April 2, 2015 and September 1, 2015). A true and correct copy of the Provider Agreement is attached hereto as **Exhibit A**.[2]

29.     All conditions precedent to filing suit have been satisfied.

30.     Specifically, Section 5 of the Provider Agreement outlines a dispute resolution process to be completed prior to filing suit. That process is initiated when one party provides written notice of the dispute to the other party. Provider Agreement Section 5.1.1. The contract then goes on to define the "First Level Dispute Process" which requires at least two meetings of a defined Working Group. *Id*. at 5.1.2. The first meeting of the Working Group must be convened within ten business days of receipt of the notice of dispute. *Id*. If the

---

[2] Florida Blue is contemporaneously filing *Plaintiffs' Motion to Seal Exhibits A and C to the Complaint and Incorporated Memorandum of Law* in accordance with Local Rule 1.09(a).

parties are unable to resolve the dispute through the First Level Dispute Process, they are to engage in the Second Level Dispute Process which requires a meeting of a Senior Working Group comprised of a vice president or senior manager from each party. *Id*. at 5.1.2.1. That Senior Working Group meeting is supposed to occur within thirty business days of receipt of the initial notice. *Id*. The contract goes on to state that if the parties are unable to resolve their dispute through the above described process within 90 days of receipt of the notice of dispute, they agree to participate in non-binding mediation. *Id*. at 5.1.2.2.

31.    Florida Blue has made all efforts to meet the conditions precedent set forth in the contract, but DaVita has refused to fully engage in that process and has, thus, waived its right to demand specific performance of those provisions.

32.    Specifically, on December 21, 2018, Florida Blue sent written notice of its dispute with DaVita to Robert Badal of DaVita, the individual designated to receive such notice on behalf of DaVita under the Provider Agreement.

33.    On January 10, 2019, Brian Stephenson of DaVita sent an e-mail responding to Florida Blue's letter acknowledging receipt of the notice letter and stating that DaVita strongly disagrees with the assertions in that letter. In that correspondence, DaVita did not ask to convene a Working Group and did not offer dates that DaVita representatives were available to meet as part of the First Level Dispute Process.

34.    In February 2019, Florida Blue's CEO and CFO met with DaVita's CEO in Jacksonville, Florida to discuss the parties' relationship, and DaVita's treatment of Florida Blue's members, since DaVita's unilateral termination of the Provider Agreement in September 2018. After that meeting, DaVita sent a settlement agreement and release to

Florida Blue that expressly sought to resolve all issues raised in the December 21, 2018 notice of dispute.

35.      The parties did not execute the proposed agreement and were otherwise unable to resolve the dispute. On April 5, 2019, more than 90 days after it sent the dispute letter, Florida Blue sent an e-mail to DaVita for purposes of initiating the non-binding mediation contemplated in the dispute resolution provision of the Provider Agreement. Specifically, Florida Blue requested that DaVita identify potential mediators by April 12, 2019.

36.      On April 12, 2019, DaVita responded and insisted that, despite the fact that more than 90 days had passed since Florida Blue provided initial notice of the dispute, and the fact that the parties most senior executives had already met, the parties started the dispute resolution process all over with the First Level Dispute Process.

37.      Florida Blue responded to that letter on April 19, 2019 explaining why the parties had substantially complied with the pre-mediation dispute resolution process or alternatively, waived the dispute resolution conditions precedent in the Provider Agreement. Notwithstanding, in an effort to avoid unnecessary back-and-forth and without waiver of its rights, Florida Blue identified the persons comprising its Working Group and Senior Working Group and provided dates that Florida Blue's Working Group and Senior Working Group were available to meet. Florida Blue also identified potential mediators and dates that those mediators are available for mediation. Florida Blue asked for a response by April 23, 2019 and noted that "if DaVita fails to respond by identifying its respective representatives

and the dates they are available, we will accept such further evidence of DaVita's waiver of

the conditions precedent outlined in the Agreement."

38.     To date, DaVita has never responded to Florida Blue's April 19, 2019 letter.

## IV.   JURISDICTION AND VENUE

39.     Personal jurisdiction is proper before this Court pursuant to Fla. Stat. § 48.193(1)(a)(1) and (2) because DaVita operates, conducts, engages in, and carries on business in this district in Florida, has offices in this state, and has committed tortious acts within this state targeted towards Florida businesses and residents, as described in this Complaint. Personal jurisdiction is also proper before this Court pursuant to Fla Stat. § 48.193(2) because DaVita is engaged in substantial and not isolated activity within this district in Florida.

40.     This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1332(a)(1) because the matter in controversy exceeds the sum or value of $75,000, exclusive of interests and costs, and is between citizens of different states.

41.     Venue is proper in this district pursuant to 28 U.S.C. § 1391(b)(2) because a substantial part of the events giving rise to the claims in this action have occurred in this district. Many individuals who have Florida Blue insurance plans are located in this district, many activities giving rise to this action have taken place in and through DaVita's dialysis centers located in this district, and harm resulting from DaVita's conduct has been felt and incurred in this district. Florida Blue also made certain commercial plans at issue in this case available in this district at all relevant times by offering them through the federal

marketplace. And Florida Blue and DaVita entered into the Provider Agreement that governs the parties' relationship in this district.

## V.     FACTUAL BACKGROUND

### A.     Treatment of Chronic Kidney Disease

42.     The kidneys play a critical role in the body's effort to excrete waste produced by metabolism. Kidneys filter blood and remove water-soluble wastes, such as urea and ammonium. Every day, the kidneys filter about 200 quarts of blood to produce about 1 to 2 quarts of urine, which is composed of wastes and extra fluid.

43.     The kidneys are important because they keep the composition of the blood stable, which lets the body function properly. Among other things, kidneys prevent the buildup of wastes and extra fluid in the body and help stabilize electrolyte levels, such as sodium, potassium, and phosphate.

44.     Chronic kidney disease ("CKD") is a condition characterized by a gradual loss of kidney function over time. There are five stages of CKD, which generally track the functionality of the kidneys. When kidney function drops to 10-15% of normal capacity, a patient is said to have stage five CKD. This stage is also referred to as end-stage renal disease ("ESRD"). ESRD is an irreversible condition.

45.     Patients with ESRD are commonly treated with dialysis, which is a process for removing waste and excess water from the blood. ESRD patients typically receive dialysis treatments three times per week for the rest of their lives.

46.     Unfortunately, dialysis does not correct the compromised functions of the kidneys. It simply replaces some of the kidneys' functions through diffusion (waste removal) and ultrafiltration (fluid removal). The only way to cure ESRD is with a kidney transplant.

**B.     Insurance Coverage for People with ESRD**

47.     Various types of insurance coverage are offered for people with ESRD.

*1.     Medicaid*

48.     Many patients with ESRD qualify to receive health insurance through Medicaid. Medicaid is a government insurance program available for families and individuals with low income or limited resources that was created by amendments to Title XIX to the Social Security Act, 42 U.S.C. § 1396, *et seq*. Medicaid is a means-tested program that is jointly funded by the state and federal governments and managed by the states. Under the program, the federal government provides matching funds to states to enable them to provide medical assistance to residents who meet certain eligibility requirements. Within the last several years, 31 states and Washington D.C. have expanded Medicaid to be available for individuals who make more than the national poverty rate.

49.     Medicaid pays for ESRD patients' dialysis and kidney transplants. Although patient responsibility amounts for healthcare services vary by state, ESRD patients who have Medicaid are 100% covered for dialysis and have very low out-of-pocket expenses for other medical care and prescriptions. Medicaid also pays for other essential non-medical services such as medical transportation and home assistance.

50.     Medicaid reimburses DaVita at a rate of less than $300 per dialysis treatment.

15

51.     Upon information and belief, many of the patients DaVita steered and induced onto Florida Blue's commercial plans were insured by Medicaid at the time of the steering. In other words, at the time of the steering, those patients' dialysis services were covered in full by Medicaid at virtually no cost to the patients. Moreover, many of the patients who were not fully insured by Medicaid at the time of DaVita's steering, presumably would have qualified for comprehensive, low-cost coverage under Medicaid and likely would have selected Medicaid coverage had they been given an opportunity to make an informed, objective decision about the insurance options available to them.

### 2.     Medicare

52.     Today, 90% of U.S. citizens who require dialysis also qualify for Medicare. Since 1973, under the law, people with ESRD have qualified for Medicare, regardless of their age, so long as they (or their spouses) have sufficient working credits. Qualifying citizens may enroll in Medicare Parts A and B, and Medicare coverage of dialysis services generally commences three months after enrollment.

53.     Medicare is an affordable means of covering dialysis and other medical services. Medicare Part B premiums are generally just over $100 per month, and the annual deductibles are also generally in the $100-$150 range. Medicare can also be much less if patients qualify for low-income assistance, and can be free for patients who qualify for Supplemental Security Income. Medicare enrollees are also responsible for a cost-sharing obligation amounting to 20% of the applicable Medicare fee schedule. The Centers for Medicare and Medicaid Services ("CMS") has set a reimbursement rate of less than $300 per treatment for dialysis services.

54.     Patients who become eligible for Medicare, including those who develop and progress to ESRD, need to enroll in Medicare in a timely fashion or they risk possibly incurring financial penalties for late enrollment. Moreover, if patients do not have Medicare when they receive a kidney transplant, Medicare Part B will not cover the cost of the necessary immunosuppressant medications patients require following a transplant.

55.     Upon information and belief, many of the patients that DaVita steered onto Florida Blue's commercial plans were eligible for Medicare at the time of the steering.

### 3.     *Private Commercial Insurance*

56.     Patients with ESRD may also have or seek insurance coverage from private individual and group commercial plans offered or administered by companies like Florida Blue. Commercial plans vary in terms of the services they cover, the facilities and providers they consider to be in-network, and the other benefits they offer. Commercial plans also generally require patients who want to be enrolled in them to purchase the coverage (by paying specific premiums), and bear some portion of the cost of the healthcare services they use (by paying some combination of deductibles, copays, and coinsurance). These requirements ensure that patients consider, and purchase, the coverage that they believe is right for them, and then remain sensitive the cost of services they receive from the providers they choose.

57.     Many patients with ESRD who are working have private commercial coverage through employer group health plans ("EGHPs"). These patients generally pay the premiums for their EGHPs by having those amounts automatically deducted from their paychecks.

58.     Private individual commercial plans are also offered by insurers pursuant to the Patient Protection and Affordable Care Act ("ACA"), as well as other non-ACA governed commercial insurance plans. The ACA created exchanges run by states and the federal government where insurance companies offer various health insurance plans for individuals to compare and purchase for themselves or their families. Plans offered through the exchanges are called Qualified Health Plans ("QHPs") and must meet certain requirements in terms of the benefits they offer, as required by the ACA.

59.     Under the Affordable Care Act, low-income individuals and families whose incomes are between 100% and 400% of the federal poverty guidelines will receive federal subsidies on a sliding scale if they purchase insurance via an exchange. These subsidies are not available for plans purchased off-exchange.

60.     Florida Blue offers a variety of commercial insurance plans, including individual plans offered on- or off-exchange, as well as fully-funded and employer self-funded group insurance plans. All of Florida Blue's commercial plans provide coverage for dialysis services, though the rates vary by type of commercial plan.

### 4.     COBRA

61.     The Consolidated Omnibus Budget Reconciliation Act, 29 U.S.C. § 1161, *et seq.*, ("COBRA") was enacted by the federal government in 1986 to provide, among other things, continuation of group commercial health coverage that otherwise might be terminated.

62.     At some point, many patients with ESRD can no longer work. When this happens, they often qualify for Medicare and/or Medicaid.

63.     Patients with ESRD who cannot continue to work can also sometimes keep their EGHPs under COBRA, which requires employers with more than 20 employees to allow individuals to keep their EGHP coverage for a temporary amount of time when coverage is lost due to certain qualifying events, including voluntary or involuntary termination of employment due to ESRD.

64.     COBRA plans provide the same benefits that the individual received prior to the loss of group coverage – *i.e.*, the same coverage for dialysis services that the individual previously had under his or her commercial group plan.

65.     The maximum period of continuation coverage is between 18 and 36 months, though it can be extended for beneficiaries with a qualifying disability. Also, COBRA enrollees are responsible for premium payments to maintain their coverage. These premium payments range from 102% to 150% of the monthly premiums associated with their previous group coverage. If payments are made in a timely fashion following the qualifying event, individuals are entitled to COBRA coverage as a matter of right.

**C.     Florida Blue's Commercial Insurance Plans**

66.     Florida Blue offers and/or administers a variety of types of commercial health insurance policies, contracts, and/or plans, including those offered on or off the health insurance exchanges pursuant to the ACA ("ACA plans"), EGHPs, and COBRA plans.

67.     In its capacity as an insurer and as a claims administrator, Florida Blue processes hundreds of thousands of health care claims per day, and is responsible for processing and administering tens of millions of health care claims per year.

68.     All of Florida Blue's commercial plans provide coverage for dialysis services, though the specific benefits relating to dialysis services vary by plan.

69.     Florida Blue's commercial plans function in accordance with insurance policies, contracts, and/or plan documents, which establish, among other things, the rights and responsibilities of the payor entities and of the individuals who have enrolled in the policies, contracts, and/or plans. Florida Blue refers to its enrollees as "members."

70.     The terms of the plans set forth several requirements designed to ensure that members pay for some portion of (a) the insurance coverage they want to purchase and (b) the cost of the healthcare services they receive from healthcare providers.

71.     Florida Blue's commercial plans require members to purchase the plan coverage and benefits by paying the required plan premiums.

72.     For example, Florida Blue's BlueChoice, PPO Family Physician Plan defines "premium" as "the total amount that [member] must pay BCBSF periodically for coverage under this Contract." The plan also states that "to be eligible to be a [member], a person must: . . . pay the required premiums."

73.     Florida Blue's commercial plans also require members to pay for all or some portion of the charges submitted by their medical providers for the services the members receive. These member payment responsibilities are referred to as "cost-sharing obligations" and generally consist of a few components.

74.     *First*, Florida Blue's plans generally require members to pay a deductible. A deductible is a dollar amount a member must pay each calendar year for the healthcare services they receive before their insurance company begins to pay for certain health

services. Until a deductible is met, a member's plan benefits and their insurer's obligation to pay for healthcare services are generally not triggered.

75.     For example, Florida Blue's BlueChoice, PPO Family Physician Plan, defines "deductible" as "the amount of charges, up to the Allowed Amount, for Covered Services which an Insured must actually pay to an appropriate licensed health care Provider, who is recognized for payment under this Contract, before BCBSF's payment for Covered Services begins."

76.     *Second*, assuming members have paid their deductibles, Florida Blue's plans generally also require members to pay coinsurance for the healthcare services they receive, until they meet the annual "out of pocket" maximum set forth in the plans. Coinsurance is the percentage of costs of a covered health care service members pay (e.g., 20% of allowed amounts) after they have paid their deductible.

77.     For example, Florida Blue's BlueChoice, PPO Family Physician Plan defines "coinsurance" as the "sharing of health care expenses for Covered Services between BCBSF and the Insured. After the Insured's Deductible requirement is met, BCBSF will pay a percentage of the Allowed Amount for Covered Services, as set forth in the Schedule of Benefits."

78.     *Third*, Florida Blue's plans sometimes require members to pay modest, fixed dollar amounts called "copays" at the time they receive certain healthcare services after their deductible is paid.

79.     For example, Florida Blue's BlueChoice, PPO Family Physician Plan defines "copayment" as "the dollar amount established solely by BCBSF which is required to be paid

to a health care Provider by an Insured at the time certain Covered services are rendered by that Provider."

80.    These Florida Blue plans' requirements provide structure to the insurance markets, help control the cost of healthcare, and serve as important checks on fraud, waste, and abuse. Since Florida Blue's members (not Florida Blue) control which healthcare services they receive, Florida Blue's plan requirements regarding member payment responsibilities ensure that members only enroll in coverage they are willing to pay for and remain sensitized to some portion of the cost of the healthcare services they receive from the providers they choose to patronize. This results in more affordable healthcare for all Florida Blue members, as well as members of the public more broadly.

**D.    Florida Blue's Provider Agreement with DaVita**

81.    As discussed above, Florida Blue and DaVita were parties to the Provider Agreement. In the fall of 2018, DaVita terminated the Provider Agreement. That Provider Agreement governs certain aspects of the parties' business relationship while it was in place. For example, the Provider Agreement addresses many aspects of the process by which DaVita provides dialysis services to Florida Blue members, and that Florida Blue pays DaVita for those services. As is discussed in greater detail below, DaVita's conduct has continued since its termination of the Provider Agreement. Florida Blue's breach of contract claims apply only to conduct that occurred while the Provider Agreement was in effect. The non-contract based causes of action cover both DaVita's past conduct and post-contract termination conduct.

82.     Before entering into the January 1, 2014 Provider Agreement, Florida Blue and DaVita entered into a Traditional Dialysis Center Services Agreement effective June 1, 2004.

83.     As a means of controlling costs to their members and improving quality of care, most commercial insurers, including Florida Blue, create provider networks for their plans. Providers who join a network enjoy the benefit of increased patient volume, as plan members are financially incentivized to seek medical treatment from in-network providers. In exchange, providers agree to certain terms set forth in a provider agreement. Providers further agree to a fee schedule that sets out the rates they will receive for the various services provided to each plan's members.

84.     The Provider Agreement contains a material provision that requires DaVita to comply with a host of laws and regulations designed to prevent deceptive and abusive conduct.

85.     Specifically, Section 2.1.1.2 of the Provider Agreement requires DaVita and each of its dialysis clinics to, throughout the term of the Agreement, "render Services in compliance with all Laws, this Agreement, the Manual for Physicians and Providers, and [Florida Blue's] policies and procedures."

86.     Schedule A to the contract states that DaVita "shall not waive, discount or rebate any such deductible, coinsurance, and/or copayment amounts without the prior written consent of Florida Blue except for demonstrated hardship and following a documented process to collect applicable deductibles, coinsurance and copayments."

E.     **The American Kidney Fund and its Relationship with DaVita**

87.     AKF is registered as a tax-exempt, non-profit organization under Section 501(c)(3) of the Internal Revenue Code. 26 U.S.C. § 501(c)(3). AKF is based in Rockville, Maryland.

88.     Publicly, AKF states that its mission is to "help people fight kidney disease and live healthier lives." (*See* AKF 2016 Form 990).

89.     Privately, AKF has become an arm of its for-profit dialysis donors, serving as a conduit dialysis providers use to make and conceal premium payments to their own patients, to induce those patients to enroll in or stay enrolled in insurance plans that pay the dialysis providers the highest reimbursement rates and continue treating at the providers' clinics.

90.     AKF did not always operate substantially or primarily for the private benefit of for-profit dialysis companies, nor was it exclusively organized to operate for the private benefit of for-profit dialysis companies. AKF was founded in 1971, and by 1995—twenty-five years after its founding—it was still a relatively small, independent charity, receiving less than $5 million a year in donations, with less than $500,000 of those donations coming from for-profit dialysis providers.

91.     That began to change in 1997, when AKF and several for-profit dialysis companies, including DaVita, asked the Office of Inspector General ("OIG") to issue an advisory opinion allowing AKF to start operating and expanding a program called the Health Insurance Premium Payment ("HIPP") program where it would take donations from the for-profit dialysis companies and use them to pay the Supplementary Medical Insurance Program

("Medicare Part B") or Medicare Supplementary Health Insurance ("Medigap") premiums of financially needy patients who were enrolled in Medicare and being treated by the donating dialysis companies.

92.     AKF sought the OIG advisory opinion because it did not want to be subject to civil monetary penalties under Section 231(h) of the Health Insurance Portability and Accountability Act of 1996 ("HIPAA"), which authorized the OIG to impose those penalties against entities who offer remuneration to Medicare or Medicaid beneficiaries that they know or should know will influence the beneficiary's decision to order or receive covered items or services from a particular medical provider.

93.     In the request to the OIG, AKF stated that dialysis company donors "will be free to determine whether to make contributions to the AKF and, if so, how much to contribute." It stated further that "[c]ontributions will be made without any restrictions or conditions placed on the donation," and that AKF's "discretion as to the uses of the contributions will be absolute, independent, and autonomous."

94.     Moreover, neither AKF nor DaVita then, or since, disclosed any intention to use the contributions of donating dialysis companies to pay those patients' EGHP, COBRA, or Affordable Care Act plan premiums, nor did they disclose how paying those premiums could impact donating companies' profits.

95.     Ultimately, the OIG issued Advisory Opinion 97-1 which set forth guidelines that AKF and its donating companies would need to follow for AKF's HIPP program to avoid being subject to civil monetary penalties. In that Opinion, the OIG stated that AKF could not "earmark" "[c]ontributions . . . for the use of particular beneficiaries or groups of

beneficiaries," "take into account the identity of the referring provider or the amount of any donation to AKF by such provider," "assure" providers "that the amount of HIPP assistance their patients receive bears any relationship to the amount of their donations," or "guarantee[] that beneficiaries [donating companies] refer to HIPP will receive any assistance at all." The OIG stated that AKF assistance should be "available to any financially needy ESRD patient regardless of provider" and should not be "limited to patients of the [donating] companies."

96.     The OIG also stated that providers could not "track the amounts that AKF pays on behalf of patients dialyzing at their facilities in order to calculate amounts of future contributions," and prohibited providers from "advertis[ing] the availability of possible financial assistance to the public[.]" The OIG also stated that Advisory Opinion 97-1 was "limited in scope to the specific arrangement described in this letter," had "no applicability to other arrangements, even those which appear similar in nature or scope[.]"

97.     Thus, subject to the restrictions and limitations of Advisory Opinion 97-1, AKF's HIPP program came into being.

98.     Today, 20 years later, AKF's HIPP program has evolved into a *de facto* profit-maximizing arm of AKF's dialysis company donors—something far different than the modest Medicare Part B and Medigap premium assistance program that AKF and DaVita pitched to the OIG in 1997.

99.     In fact, AKF and a handful of large dialysis providers (including DaVita) have turned AKF's HIPP program into a lucrative investment vehicle, wherein the dialysis providers use AKF as a conduit to pay (and conceal the fact that they are paying) the commercial insurance premiums of patients dialyzing at their facilities, to induce them to

enroll in or stay enrolled in the insurance plans that in turn pay lucrative reimbursement rates to the dialysis providers.

100.    By routing massive sums of money to their patients through a "charity," DaVita and other providers are able to mask the apparent source of the funds, and conceal the fact that they are paying their patients' premiums from insurers.

101.    Crucially, AKF has made it clear that if providers it distribute funds sufficient to pay providers' patients' premiums,  the providers need to "donate" corresponding sums of money to AKF's HIPP program.

102.    Indeed, AKF has instructed and required providers to calculate and contribute sums to AKF that correspond to the amount of money those providers want or expect their patients to receive from AKF's HIPP program.

103.    This "pay-to-play" requirement is embodied in what AKF has called its "fair share" requirement and "Honor System."

104.    As recently as 2016, AKF had posted its HIPP Guidelines, which included a section describing the "HIPP Honor System," on its website. In that section, AKF set forth its requirement that "each referring dialysis provider should make equitable contributions to the HIPP pool" and that each provider should "reasonably determine its 'fair share' contribution to the pool [i.e., the funds available for premium assistance] by considering the number of patients it refers to HIPP." (*See* **Exhibit B**.) AKF emphasized that all providers had an "ethical obligation to contribute their respective 'fair share' to ensure that the HIPP pool is adequately funded." (*Id.*) And AKF instructed providers that "[i]f your company cannot

make fair and equitable contributions, we respectfully request that your organization not refer patients to the HIPP program . . . ." (*Id.*)

105.    The message from AKF could not have been clearer: if providers wanted AKF to use their "donations" to pay their patients' premiums, the providers needed to calculate and contribute amounts of money commensurate with the amount of money their patients would require for premium payments. And if providers did not contribute their "fair share" to AKF, they should not expect their patients to receive HIPP funding.

106.    AKF's Form 990 tax filings show that it is now operating substantially and primarily for the private benefit of the nation's large for-profit dialysis providers, including DaVita. In 2014, AKF collected cash contributions of $236,848,398 primarily from a handful of private donors and paid out $221,389,802 in premium assistance. In 2015, AKF collected cash contributions of $264,353,872 primarily from a handful of private donors and paid out $251,193,896 in premium assistance. In 2016, AKF collected cash contributions of $308,829,440 primarily from just five private donors and paid out $285,525,417 in premium assistance. And in 2017, AKF collected cash contributions of $297,553,398 from a small number of private donors and paid out $273,273,359 in premium assistance. Public sources report that the bulk of AKF's payouts during these years have been to patients receiving dialysis services at clinics owned by AKF's private donors, including DaVita.

107.    Upon information and belief, based on AKF's Form 990 tax filings, its 2014 single-donor cash contributions of approximately $88 and $100 million, its 2015 single-donor cash contributions of approximately $98 and $108 million, its 2016 single-donor cash contributions of approximately $119 and $123 million, and its 2017 single-donor cash

contributions of approximately $120 and $126 million came from DaVita, Inc. and Fresenius Medical Care—the two largest for-profit dialysis providers in the country.

108.   Recently, disparate pieces of information about how AKF's HIPP program actually works have started to leak out.

109.   For example, on December 25, 2016, *The New York Times* published an exposé on AKF and its relationship with dialysis providers, entitled "Kidney Fund Seen Insisting on Donations, Contrary to Government Deal." (*See* Katie Thomas & Reed Abelson, *Kidney Fund Seen Insisting on Donations, Contrary to Government Deal*, THE NEW YORK TIMES (Dec. 25, 2016), https://www.nytimes.com/2016/12/25/business/kidney-fund-seen-insisting-on-donations-contrary-to-government-deal.html.)

110.   The article stated that "For years, . . . the Kidney Fund's preference for patients at the biggest clinics has been an open secret among many social workers," and noted that 78 percent of AKF's 2015 reported revenue of $264 million came from two dialysis providers – DaVita and Fresenius. The article also reported that AKF "has resisted giving aid to patients at clinics that do not donate money to the fund" and that those "actions have limited crucial help for needy patients at these clinics." Pointing out that "[t]he agreement governing the relationship between the group and [dialysis providers] forbids choosing patients based on their clinic," the article nonetheless reported that "[i]n multiple cases, the charity pushed back on workers at clinics that had not donated money, discouraging them from signing up their patients for assistance." The article also observed that, "[u]ntil recently, the Kidney Fund's guidelines even said clinics should not apply for patient aid if the company had not donated to the charity," quoting the guidelines as stating

"[i]f your company cannot make fair and equitable contributions, we respectfully request that your organization not refer patients." And the article cited multiple examples of AKF demanding that dialysis providers "make a donation that at a minimum covered the amount [AKF] had paid for [a] patient's premium," threatening to cut off assistance for patients if such donations were not made, and, in some instances, refusing to pay patients' monthly premiums until those patients' dialysis providers made their monthly contributions to the HIPP fund.

111.   Other information suggesting that AKF's HIPP program has also not been operating solely as a "last resort" source of assistance, as its own guidelines say it must, has also come to light. According to AKF's guidelines, HIPP is supposed to be "a 'last resort' source of assistance" wherein its funds are "restricted to patients who ha[d] limited means of paying health insurance premiums … and who would forego coverage without the benefit of HIPP." (**Exhibit B** at 6.) As the guidelines make clear, "[a]lternative programs that pay for primary or secondary health coverage . . . such as Medicaid . . . **must** be utilized first." (*Id.*) (emphasis in original). In other words, patients whose dialysis services could be covered by Medicaid, Medicare, or another public-assistance program were not supposed to be receiving AKF HIPP funding to pay for the premiums of commercial plan coverage when they could have used Medicaid to cover their dialysis services at no cost.

112.   Florida Blue has recently discovered that many of its commercial insurance plan members treating at DaVita facilities have been receiving AKF HIPP funding to pay their premiums, despite being eligible for or enrolled in Medicaid, and despite the fact that they would not forego that coverage without the benefit of HIPP.

113.     Separately, DaVita social workers have also been anonymously disclosing how DaVita actually uses AKF. As discussed below, toward the end of 2016, CMS put out a Request for Information ("RFI") to the dialysis community, asking for information about how dialysis providers were steering Medicare and Medicaid-eligible patients into ACA plans. Several current and former DaVita social workers responded anonymously by publicly submitting pieces of information suggesting that AKF is not acting as an independent entity for charitable purposes. For example:

- One former DaVita social worker explained that "corporate launched an individual market plan initiative, "tasked the social workers with identifying out patients who were insured with [a certain Medicaid plan] only[,]" "asked [the social workers] to 'educate' the patients with marketing material DaVita designed specifically to entice the patient into enrolling in a secondary private payer plan. . . ." and "assured our most vulnerable population of patients that they would not have to worry about paying their health insurance premium because our Insurance Counselors would preapprove them for the AKF HIPP grant."

- A kidney transplant social worker stated, "In my experience, DaVita Dialysis has inappropriately steered all pts on medical assistance to individual market plans" and that "[t]he dialysis co provides contributions to American Kidney Fund to pay the premiums and then dialysis gets reimbursed at a higher rate."

- A former DaVita insurance counselor confirmed that DaVita was involved in rampant patient steering, and disclosed that DaVita closely tracked "their

AKF enrollees and how much money goes for each person that receives assistance."

- And a nephrology social worker who had worked with various dialysis companies for over two decades stated, "Unfortunately over the years, the practice of steering patients to commercial insurances and paying for their coverage through donations to the American Kidney Fund (AKF) has become akin to money laundering. I implore you to **dig deeply** into the accounting practices of . . . DaVita, to discern the practice of linking patients with the amount of donations made to AKF. Many social workers have been concerned about this practice for several years." (emphasis in original).

114. Upon information and belief, DaVita has been calculating its "donations" to AKF's HIPP program to correspond as close as possible to the amount of premium payment money DaVita expects its patients will need to draw from the HIPP fund, and because DaVita does so, AKF ensures that those funds get distributed back to DaVita's designated patients. Moreover, upon information and belief, DaVita has taken on administering certain aspects of AKF's HIPP program, and is able to determine when and in what amounts premium payment checks are sent to its own patients.

115. DaVita has also openly advertised the availability of HIPP funds, violating the OIG's prohibition of exactly that practice. The availability of HIPP assistance was a regular component of DaVita's steering "pitch" to its patients and DaVita even prominently displayed information about the program on its own website for years.

116.    Pieced together, different pieces of information show HIPP has not been operating legally, or the way AKF and DaVita told HHS-OIG it would operate.

117.    Upon information and belief, AKF has been operating in violation of the restrictions set forth in Advisory Opinion 97-1 by earmarking DaVita's contributions for the use of DaVita's patients, taking into account DaVita's identity and the amount of DaVita's "donations" to AKF in deciding whether to distribute funds to DaVita's patients, assuring DaVita  that the amount of HIPP assistance its patients will receive bears a relationship to the amount of DaVita's donations, and restricting HIPP funds to patients of donating providers like DaVita.

118.    Upon information and belief, AKF has also failed to maintain independence and autonomy from DaVita, by allowing DaVita to use HIPP as a conduit through which to pay its own patients, and by allowing DaVita to access its HIPP program and take actions to cause premium payment checks to be sent to DaVita patients.

119.    In sum, AKF is now being used by large dialysis providers like DaVita to pay their own patients' premiums to induce them to enroll or stay enrolled in commercial insurance plans that pay the providers the highest reimbursement rates, and to reward them for receiving, dialysis services from providers on terms that are in the providers' financial interest. AKF is also being used and operated, by design, to conceal from insurers like Florida Blue the fact that DaVita is funding and paying for its own patients' insurance premiums to serve its own financial interests.

120.    AKF knows that DaVita uses AKF to conceal and route money for insurance premiums to its dialysis patients.

121.     Simply put, AKF is not operating as an independent, autonomous, 501(c)(3) charity. Rather, it is operating for the private benefit of a small number of large for-profit dialysis companies like DaVita who influence, control, and administer many aspects of AKF's HIPP program.

122.     DaVita's own public disclosures suggest it is not donating massive sums of cash to AKF to be charitable, but rather is doing so in order to serve DaVita's own financial interests and maximize its potential return on its "charitable" investment. For example, in a supplemental 8-K filing dated October 31, 2016 DaVita announced to its investors that "a policy change that prevents patients with minimum essential Medicaid coverage from accessing charitable premium assistance to enroll in ACA Plans would result in a reduction in its annualized operating income of up to approximately $140 million before any offsets. If CMS were to issue a broader ruling that made access to charitable premium assistance unavailable to all ESRD patients on ACA Plans, the estimated financial impact would increase by up to $90 million."

123.     Likewise, in its 10-K filing dated February 24, 2017, DaVita disclosed that "if any . . . challenges to kidney patients' use of premium assistance are successful or regulators impose restrictions on the use of financial assistance from such charitable organizations such that these patients are unable to obtain, or continue to receive or receive for a limited duration, such financial assistance, *our revenues, earnings, and cash flow could be substantially reduced*."

124.     Relatedly, on October 9, 2017, AKF disclosed for the first time that it had been providing premium payment money to 21,000 non-ACA commercial plan members.

That disclosure prompted J.P. Morgan to issue a report downgrading DaVita's stock, having used AKF's numbers to estimate that "60-80% plus of [DaVita's] earning power is derived from its AKF relationship[.]" J.P. Morgan also questioned the "legal legitimacy" of DaVita's financial relationship with AKF.

125.    These events forced DaVita to start disclosing some of its conduct. Thus, in a press release dated October 10, 2017, DaVita disclosed that approximately 25,000 of its patients were receiving premium payment money from AKF, including 1,800 patients who were enrolled in ACA plans and another 4,000 who were enrolled in EGHP and COBRA plans.

126.    Collectively, DaVita estimated that the aggregate operating income it was deriving from reimbursement payments received from these two AKF-funded sub-groups of patients ranged between $495 million and $540 million. These disclosures confirmed that *the majority of DaVita's annual profits* were dependent on its financial relationship with AKF.

127.    On information and belief, the relationship between AKF and DaVita is now currently the subject of an ongoing criminal investigation. On January 6, 2017, *The Wall Street Journal* reported that the U.S. Department of Justice had commenced a probe into DaVita's relationship with the AKF and, as part of the investigation, the U.S. Attorney's Office for the District of Massachusetts had issued a subpoena seeking information relating to DaVita's AKF donations. AKF has also reportedly been served with Department of Justice subpoenas.

F.     **DaVita's Scheme Harms Florida Blue, Florida Blue Members, and the Health Insurance Market**

1.     *DaVita Targeted and Steered Patients in Florida into Florida Blue's Commercial Plans*

128.    DaVita provides dialysis services to Florida residents suffering from ESRD through the more than 250 dialysis centers that it owns, operates, and manages across the State of Florida.

129.    Pursuant to the Provider Agreement, DaVita is paid for providing dialysis services to Florida Blue's members through a combination of payments received from Florida Blue and from the members themselves in the form of the deductible, copay, and coinsurance obligations required by the members' insurance plans, as described above.

130.    Although the *services* DaVita provides to a patient do not vary depending on the patient's insurance plan, the "benefit" payment DaVita receives from the patient's insurer for those services varies greatly depending on the patient's coverage.

131.    For example, if a patient is covered by Medicaid, then DaVita would receive the State Medicaid reimbursement rate, which on average amounts to $230 per visit for dialysis treatments in Florida. But if the patient is covered by a Florida Blue private commercial plan, then DaVita could receive a higher reimbursement rate for the same services.

132.    Therefore, for DaVita to maximize the reimbursement rates it received for dialysis services, DaVita first needed to come up with a way to convince its patients to enroll in, or stay enrolled in, the commercial insurance plans DaVita coveted, even though they were eligible for Medicare or Medicaid.

133.    In order to "steer" its patients into commercial insurance plans, or to keep them enrolled in commercial insurance plans, including Florida Blue plans, DaVita formulated and deployed a corporate-wide strategy that is outlined below.

134.    *First*, DaVita scoured its rosters of patients and identified those who were eligible for, or enrolled only in, Medicaid or Medicare. Upon information and belief, DaVita also identified those of its patients who might soon be eligible to transition from an EGHP to Medicaid or Medicare, who DaVita wanted to keep on their EGHPs through COBRA.

135.    DaVita then used its insurance counselors and social workers, who had a relationship of trust with their patients—many of whom lacked a sophisticated understanding of health insurance, and many others who were not native English speakers—to do its bidding.

136.    DaVita armed its insurance counselors and social workers with marketing materials DaVita had prepared and strict directives regarding how to convince as many patients as possible to become enrolled in commercial insurance plans.

137.    DaVita and its employees:

- Selected specific commercial insurance plans they wanted their patient "targets" to become enrolled in;

- Told the patients that commercial insurance plans were in their best interest, and counseled patients to enroll in them (or allow DaVita to enroll them);

- Provided patients with inaccurate, misleading, and incomplete information about the features and benefits of commercial insurance plans;

- Promised patients that if they enrolled or stayed enrolled in commercial insurance plans, they would not have to pay the plan premiums for the coverage or the cost-sharing obligations for their dialysis treatments;

- Ignored or denigrated Medicaid and Medicare as insurance options; and

- In many cases, enrolled the unwitting patients into DaVita's preferred commercial insurance plans.

138.    DaVita directed this conduct at patients who it caused to become or stay enrolled in commercial plans offered by many insurers, including commercial insurance plans offered by Florida Blue, to serve its own financial interests.

139.    Recently, DaVita's investors filed a class action complaint against DaVita in the District of Colorado alleging that DaVita violated federal securities laws by engaging in the conduct described herein and then lying about it. The case is captioned *Peace Officers' Annuity and Benefit Fund of Georgia, et al. v. DaVita Inc., et al.*, Case No. 1:17-cv-00304-WJM-CBS (D. Col. 2017). The investors amended that complaint on January 12, 2018, and included, for the first time, detailed allegations based on their counsel's independent investigation and review of internal DaVita documents and interviews with high-ranking former DaVita employees, as well as other sources.

140.    Although too voluminous to repeat here, the *Peace Officers'* Amended Class Action Complaint revealed that DaVita had been engaging in the aggressive behavior described herein as a matter of nationwide corporate strategy, formulated at and directed by employees and executives at its Denver, Colorado headquarters.

141.    Among other things, the *Peace Officers*' Amended Class Action Complaint demonstrated that:

- Internal DaVita documents and statements from former employees confirmed that DaVita's officers, mangers, and executives developed a plan and directed DaVita facilities across the country to steer patients off government plans and into AKF-backed commercial insurance plans.

-  This directive was disseminated in the form of "Village Announcements" informing employees that getting increased numbers of patients into commercial insurance plans was a top priority. DaVita implemented company-wide "Private Pay Incentive Programs" in 2014 that offered bonuses to employees that converted the most patients to commercial insurance. DaVita developed and rolled out a company-wide initiative in the summer of 2015 called the "Medicaid Opportunity." DaVita then disseminated materials regarding this initiative to all employees to show that its singular purpose was to steer all of its government-insured dialysis patients onto AKF-funded plans.

- DaVita executives conducted training programs where they instructed attendees to "get [the] American Kidney Fund to pay for exchange plans," taught attendees steering techniques, instructed insurance counselors to promote commercial insurance over Medicare, and told insurance counselors that it was "important for us to get [the patients] onto private insurance. Even if they qualified for Medicare or Medicaid, you were

encouraged to get them on private insurance." These training programs included "80-hour two-week training program[s] at the Company's headquarters in Denver in August 2015 about steering patients off of Medicaid and into commercial plans."

- As part of this training program, DaVita prepared propaganda-like materials for employees to use with patients that promoted commercial plans and either ignored or disparaged Medicare and Medicaid, often with unsubstantiated, misleading, or false claims. DaVita management was also "very hungry" to make sure DaVita employees got patients into COBRA plans as well as ACA plans.

- DaVita frequently wrote off deductible obligations that patients who had been enrolled in commercial policies owed for their dialysis services, in order to make sure those patients were not discouraged from enrolling or staying enrolled.

142.    Shortly before the *Peace Officers*' case was filed, CMS publicly expressed its significant concerns that dialysis providers like DaVita were engaging in inappropriate conduct designed to steer people eligible for or receiving Medicare and/or Medicaid benefits into private ACA plans for the purpose of obtaining higher reimbursement rates. Accordingly, as discussed above, on August 18, 2016, CMS released an RFI regarding the existence and nature of the practice.

143.    In the RFI, CSM identified the type of behavior DaVita has engaged in as being dangerous, harmful, inappropriate, and unlawful.

144.    CMS stated that it had learned of "reports that individuals who are eligible for Medicare and/or Medicaid benefits are receiving premium and other cost-sharing assistance from a third party so that the individual can enroll in individual market plans for the provider's financial benefit. In some cases, a health care provider may estimate that the higher payment rate from an individual market plan compared to Medicare or Medicaid is sufficient to allow it to pay a patient's premiums and still financially gain from the higher reimbursement rates." CMS also emphasized that insurance "[e]nrollment decisions should be made, without influence, by the individual based on their specific circumstances, and health and financial needs."

145.    CMS explained that "when health care providers or provider-affiliated organizations steer or influence people eligible for or receiving Medicare and/or Medicaid benefits, it may not be in the best interests of the individual, it may have deleterious effects on the insurance market, including disruptions to the individual market risk pool, and it is likely to raise overall healthcare costs." And CMS further explained that "there is potential for financial harm to a consumer when a health care provider or provider-affiliated organization (including a non-profit organization affiliated with the provider) steers people who could receive or are receiving benefits under Medicare and/or Medicaid to enroll in an individual market plan. The potential harm is particularly acute when the steering occurs for the financial gain of the health care provider through higher payment rates without taking into account the needs of these beneficiaries. People who are steered from Medicare and Medicaid to the individual market may also experience a disruption in the continuity and coordination of their care as a result of changes in access to their network of providers,

changes in prescription drug benefits, and loss of dental care for certain Medicaid beneficiaries." CMS also made clear that "it is unlawful to enroll an individual in individual market coverage if they are known to be entitled to benefits under Medicare Part A, enrolled in Medicare Part B, or receiving Medicaid benefits."

146.    Finally, CMS emphasized that "offering premium and cost-sharing assistance in order to steer people eligible for or receiving Medicare and/or Medicaid benefits to individual market plans for a provider's financial gain is an inappropriate action that may have negative impacts on patients" and "strongly encourage[d] any provider or provider-affiliated organization that may be currently engaged in such a practice to end the practice."

147.    In response to the RFI, several current and former DaVita social workers responded by anonymously disclosing information suggesting that DaVita was engaged in the corporate-wide practice of inappropriate and unlawful steering and patient inducements.

148.    For example, one social worker stated that, "In my experience, DaVita Dialysis has inappropriately steered all pts on medical assistance to individual market plans." Another social worker stated that, while he or she was employed at DaVita "corporate launched an individual market plan initiative and tasked the social workers with identifying our patients who were insured with '[a certain Medicaid plan] only.' They asked us to 'educate' the patients with marketing material DaVita designed specifically to entice the patient into enrolling in a secondary private payer plan . . . I knew this was an unethical practice[.]" And yet another DaVita employee described multiple instances in which DaVita insurance counselors instructed Medicare-eligible patients to not enroll in Medicare, and to instead enroll in private ACA and COBRA plans.

149.    Florida Blue has interviewed members with ESRD who were enrolled in its commercial insurance plans, and many of them reported that DaVita had steered them into those plans, and away from primary Medicaid or Medicare coverage, using the tactics described herein.

150.    DaVita's conduct has pushed large numbers of dialysis patients eligible for Medicare or Medicaid into Florida Blue commercial plans, or kept them on those plans even though they were eligible for Medicare or Medicaid, and has caused millions of dollars in damages to Florida Blue.

### 2.    DaVita Used AKF as a Conduit to Pay Its Patients' Premiums

151.    DaVita understood that in order for its scheme to succeed, it needed to induce the patients it targeted to enroll or stay enrolled in the Florida Blue commercial insurance plans DaVita preferred. DaVita specifically understood that if the patients had to purchase the plans themselves by paying the premiums the plans required, its scheme would fail, as many or all of them would opt to have Medicaid or Medicare as their primary insurer instead.

152.    Thus, to defeat the premium payment requirements and provisions of patients' Florida Blue plans, DaVita funneled millions of dollars through AKF and back to its patients to pay their insurance plan premiums. Upon information and belief, DaVita employees also accessed and logged into the administrative system AKF set up for HIPP and used it to cause premium payment checks to be sent to DaVita patients. AKF administers its HIPP program through what it calls its "Grants Management System" ("GMS"), which is an online portal. Though the mechanics of how this system works are not publicly available, publicly-

available materials suggests that DaVita employees could be able to use the system to cause premium payments to go to DaVita's own patients.

153.    For example, the current version of AKF's HIPP Guidelines acknowledge that dialysis company employees can register to gain access to and use GMS, and AKF's website links to a GMS login page designed to allow just that. AKF's HIPP Guidelines also state that "patients must work with their renal professional (or their assigned AKF contact) to ensure that subsequent grant installments are released for payment within GMS." This suggests that DaVita professionals who have access to GMS are capable of taking some action within GMS that sends or causes premium payments to go to DaVita patients.

154.    As described above, DaVita's arrangement with AKF was a "pay-to-play" relationship, where substantial payments from DaVita to AKF were required if DaVita wanted AKF to route, or allow DaVita to route, the money back to DaVita's patients under the guise of "charitable" grants. AKF made it clear that if DaVita wanted AKF to make premium assistance "grant" money available to DaVita's patients, DaVita had to pay AKF substantial sums to fund those "grants" on a regular basis. In other words, DaVita had to pay AKF to route DaVita's "donations" back to DaVita's patients, for DaVita's financial benefit. DaVita calculated its "donations" to AKF to correspond with the amount of premium payment money it wanted and expected its patients to receive, and AKF and DaVita then distributed those "donations" back to DaVita's designated patients.

155.    DaVita also concealed and failed to disclose the fact that it was engaging in this routine and systemic practice of paying patient premiums from Florida Blue.

156.     Florida Blue has interviewed members with ESRD who were enrolled in its commercial insurance plans, and many of them reported that DaVita had connected them with AKF money and that some or all of their premiums were being paid for with money coming from AKF/DaVita.

157.     DaVita's premium payment scheme with AKF induced patients to (a) enroll or remain enrolled in Florida Blue's commercial plans and (b) continue receiving dialysis at DaVita clinics under circumstances most financially favorable to DaVita. It also interfered with, undermined, and defeated the provisions of Florida Blue's plans that required enrolled members to pay their own premiums. This scheme allowed DaVita to bill Florida Blue for millions of dollars for dialysis and other services that otherwise would never have been billable to Florida Blue. The scheme also resulted in Florida Blue paying millions of dollars for non-dialysis services for members that were only enrolled in (or only remained enrolled in) Florida Blue plans as a result of DaVita's impermissible conduct and funding of the plan premiums.

158.     DaVita's "donations" to AKF and subsequent premium payments to patients are kickbacks, bribes, and illegal remuneration designed to generate business, patronage, and a private financial benefit for DaVita, and are not charitable by any measure.

159.     DaVita's relationship with AKF is also inconsistent with and not sanctioned by Advisory Opinion 97-1, and violates several of the restrictions set forth in that Opinion.

160.     Florida Blue has been duped into paying millions of dollars for dialysis services rendered by DaVita on claims tainted by DaVita's plan interference and improper financial inducements.

### 3.      *DaVita Waived or Eliminated Patients' Cost-Sharing Obligations*

161.    Even though DaVita was paying Florida Blue's members' premiums (using AKF to conceal as much), DaVita knew that its overall scheme would still fail if it held the patients it had steered into Florida Blue's plans financially responsible for any portion of the cost of the frequent dialysis services they received at DaVita clinics. Specifically, DaVita knew that the patients it had steered would not want to pay the significant deductibles Florida Blue's plans required them to pay in order for their plan benefits to be triggered, or the significant cost-sharing amounts Florida Blue's plans required them to pay for their dialysis services. DaVita also knew that the patients might choose to drop their Florida Blue coverage and revert to Medicare or Medicaid if they had to pay for any portion of the cost of their DaVita dialysis treatments.

162.    Thus, to interfere with, undermine, and defeat the cost-sharing provisions of Florida Blue's plans, and to induce its patients to continue treating at its clinics while remaining enrolled in Florida Blue's plans, DaVita systematically promised to waive and/or not collect the Florida Blue members' cost-sharing obligations – including deductibles, copayments, and coinsurance.

163.    DaVita also promised Florida Blue members that they would not be responsible for paying DaVita for any out-of-pocket costs associated with their DaVita dialysis treatments, and that DaVita would accept as payment in full whatever amounts it could cause Florida Blue to pay.

164.    This was not done to ease an otherwise unavoidable financial burden for these patients.  Rather, DaVita decided to waive the cost-sharing obligations believing that the

money it forewent from these patients would pale in comparison to the additional dollars DaVita would extract from Florida Blue by keeping them on Florida Blue plans.

165.     Upon information and belief, at the beginning of each plan year, DaVita also instructed Florida Blue members to refrain from seeking treatment from other medical providers, including specialists, until after those patients had hit their entire deductible at DaVita clinics. DaVita did this to ensure that it could control whether the members were ever asked to pay their required deductibles, and to ensure it would start getting paid by Florida Blue after Florida Blue assumed that the members had satisfied those deductible obligations.

166.     DaVita did in fact waive and fail to collect these amounts from the Florida Blue members, effectively providing them with free dialysis.

167.     DaVita also concealed and failed to disclose the fact that it was engaging in this routine and systemic practice from Florida Blue.

168.     Florida Blue interviewed members with ESRD who were enrolled in its commercial insurance plans and many of them reported that they had not made any out-of-pocket payments to DaVita, and that DaVita had told them not to worry about making any of those payments.

169.     Through this conduct, DaVita induced Florida Blue members to receive dialysis services from DaVita under conditions that were in DaVita's financial self-interest. DaVita also induced Florida Blue members to remain on commercial insurance plans instead of enrolling in more affordable Medicare and/or Medicaid plans for which they were eligible.

170.     The systematic and routine waiver of patients' cost-sharing obligations is widely recognized to be a fraudulent, abusive, inappropriate, unethical, and unlawful practice

within the healthcare industry. Indeed, many states have recognized that schemes like the one DaVita has employed victimize health insurers and their insurance plans, including the members who are enrolled in them, and exponentially increase the cost of healthcare to the entire population.

171.    For example, Florida law provides that it is insurance fraud for any services provider, other than a hospital, to engage in a general business practice of billing amounts as its usual and customary charge, if the provider has agreed with the insured or intends to waive deductibles or copayments or does not intend to collect the total amount of the charge. Fla. Stat. § 817.234(7).

172.    Moreover, as early as 1994, the Department of Health and Human Services Office of Inspector General issued a special fraud alert noting that the "[r]outine waiver of deductibles and copayments by charge-based providers, practitioners or suppliers is unlawful because it results in (1) false claims, (2) violations of the anti-kickback statute, and (3) excessive utilization of items and services paid for by Medicare." *See* Office of the Inspector General, OIG Special Fraud Alert (May 1991), *Routine Waiver of Copayments and Deductibles under Medicare Part B*, *reprinted in* 59 Fed. Reg. 65372, at *65374 (Dec. 19, 1994). These same concepts apply in the commercial insurance context.

173.    As a result of DaVita's actions, Florida Blue has paid out millions of dollars for dialysis services that it otherwise would not have paid.

### 4.     Interviews with Florida Blue Members Confirm DaVita's Scheme

174.    In an effort to determine how Florida Blue members who are receiving treatment at DaVita's dialysis centers ended up enrolled in Florida Blue's commercial insurance plans, Florida Blue interviewed a small subset of these members and their family.

175.    The interviewees consistently reported that DaVita had employed some combination of the tactics described herein. Specifically, the members reported that DaVita handled enrolling them in Florida Blue commercial insurance plans, that their plan premiums were being paid with money coming through AKF, and that they had not paid DaVita for any costs associated with their dialysis treatments.

176.    For example, "Member 1", a non-native English speaker, confirmed that a DaVita employee told him to enroll in Florida Blue's MyBlue Silver Plan. He confirmed that the DaVita employee did not tell him about any other insurance options available to him. Member 1 confirmed that he brings his premium bills to the dialysis center which then facilitates their payment using a check card that is sent to Member 1 every three months. Member 1 reported that he does not pay co-pays or co-insurance to DaVita.

177.    Similarly, "Member 2," another non-English speaker, confirmed that a DaVita social worker helped enroll Member 2 in his Florida Blue insurance plan. The DaVita social worker did not tell him about any other insurance options available to him. Member 2 was told that his premiums would be paid by the AKF. AKF sent him a bank card to pay his premiums. Member 2 recently got a kidney transplant and now, AKF no longer pays his insurance premiums.

178.    Attached as **Exhibit C** are exemplary claims that DaVita billed Florida Blue for dialysis services provided to Member 1 and Member 2.

### 5.    *DaVita Submitted Deceptive and Fraudulent Claims to Florida Blue*

179.    As a final step in its scheme, DaVita endeavored to bill Florida Blue in a misleading and deceptive way for the dialysis services rendered to Florida Blue's members, in order to cause Florida Blue to pay DaVita the sums it desired.

180.    Florida Blue receives hundreds of thousands of healthcare claims per day and works hard to adjudicate, process, and pay them expeditiously. Because of this extraordinary volume, Florida Blue reasonably relies on the truth, accuracy, and completeness of the claims submitted by providers like DaVita for services rendered to Florida Blue's members. Florida Blue also assumes that its members have enrolled in their Florida Blue plans without undue influence by their providers and that the members—not their providers—are paying for their insurance coverage and their portion of the costs of their care.

181.    DaVita knows this, and has taken advantage of it, submitting claims that have misrepresented, concealed, and failed to disclose material facts in an effort to mislead and induce Florida Blue into approving and making payments that it otherwise would not approve. Specifically, DaVita does this to mislead Florida Blue about its role in enrolling patients into Florida Blue's plans, its systemic payment of Florida Blue members' premiums, and its routine waiver of the members' cost-sharing obligations associated with the dialysis services DaVita has rendered.

182.    DaVita submits claims to Florida Blue using standard forms and their electronic equivalents, in accordance with the terms of the Provider Agreement. (*See* **Exhibit**

**A** at Section 4.2.) These forms are approved and generated in connection with the federal Medicare program, and it is common in the healthcare industry for these same forms to be used in connection with other governmental and commercial insurance. The forms require providers to describe the services provided and the procedures performed using certain mandated coding regimes. The forms also require providers to set forth their "Charges" for each service or procedure and to list the "balance due" or "est. amount due."

183.    The UB-04 form, which DaVita has utilized to submit the vast majority of claims to Florida Blue, also contains certifications to which DaVita affirmatively attests every time it uses the form to bill Florida Blue for dialysis services. Specifically, the UB-04 form states that: "Submission of this claim constitutes certification that the billing information as shown on the face hereof is true, accurate and complete" and that "the submitter did not knowingly or recklessly disregard or misrepresent or conceal material facts."

184.    This statement on the UB-04 form, among other things, obligates DaVita to accurately represent all information on its claim and to refrain from disregarding, concealing, misrepresenting, or failing to disclose material information from Florida Blue that DaVita knows bears on Florida Blue's ability to determine whether the claims being submitted should be paid and, if so, in what amount.

185.    DaVita thus understands that when it uses claim forms (or their equivalents) to submit charges to Florida Blue, it is representing that its charges are accurate and payable and that no material information bearing on Florida Blue's payment decision has been disregarded, withheld, or concealed. DaVita also understands that Florida Blue relies on the

information and certifications in the claims DaVita submits in deciding whether, and in what amount, to pay the claims.

186.     Nevertheless, the claims DaVita submits to Florida Blue contain material misrepresentations.

187.     In each claim, DaVita set forth charges and told Florida Blue that it was entitled to be paid on those charges, even though it was in fact not entitled to be paid on those charges, due to its conduct described herein.

188.     For example, because DaVita did not collect required patient obligations like deductibles and coinsurance obligations, charges contained in the claims DaVita submitted are not payable. Nevertheless, DaVita submitted charges to Florida Blue for its patients representing that it was entitled to be paid on the charges for purposes of causing Florida Blue to pay the claims based on the charges set forth therein.

189.     DaVita's claims are also tainted by multiple other forms of unlawful remuneration, as described herein, rendering them not payable. In each claim, DaVita also untruthfully represented and certified that the claims were true, accurate, and complete, and that it had not knowingly or recklessly disregarded, misrepresented, or concealed material facts. In reality, DaVita billed Florida Blue charges having knowingly and/or recklessly disregarded and concealed the material facts that it had been providing the relevant Florida Blue members with free Florida Blue insurance (by using AKF to systematically pay their premiums and disguise as much) and free dialysis (by waiving and failing to collect their cost-sharing obligations).

190.    Separate from its false certifications, DaVita made misrepresentations in connection with the claims it submitted by concealing and failing to disclose material facts that it was paying Florida Blue member premiums and waiving member cost-sharing obligations. Indeed, as described above, DaVita used AKF as an intermediary specifically to hide the fact that DaVita was paying its patients premiums.

191.    DaVita's concealment and failure to disclose these material facts were calculated to induce and deceive Florida Blue into falsely believe that its members were paying their plan premiums and the cost-sharing obligations associated with the DaVita dialysis services they ostensibly chose to receive, as required, so that Florida Blue would continue paying the claims DaVita submitted.

192.    DaVita had special, unique possession and knowledge of these material facts which it actively concealed and failed to disclose, which Florida Blue had no access to and could not discover by ordinary observation.

193.    As a result of DaVita's conduct and deceptive billing, Florida Blue has paid out tens of millions of dollars for dialysis services for which Florida Blue would not have paid had it known of the material facts DaVita misrepresented and concealed.

### 6.    DaVita's Conduct Harms the Health Insurance Markets

194.    Importantly, DaVita's conduct harms not only private payers like Florida Blue, but also individual people enrolled in or looking to enroll in health benefit plans, the health insurance markets, legitimate business, and the American public at large.

195.    Indeed, by misleading, steering, and using remuneration to induce unwitting people into the insurance plans it desires, a provider can generate the following harms,

among others: subordinating individual consumers' best interests to their providers' financial interests, increasing the actual financial burdens individual consumers must bear for their care, disrupting consumers' insurance coverage and network of treating physicians, negatively impacting consumers' eligibility for and ability to access other healthcare benefits (including those potentially available during the present or future under Medicare), negatively skewing the individual insurance market risk pools, and adding artificial and unnecessary costs onto the healthcare system thereby raising costs for everyone. Indeed, undetected healthcare fraud and abuse adds massive costs to the healthcare system every year—costs which everyone bears.

196.   CMS has stated as much, by recognizing that "there is potential for financial harm to a consumer when a health care provider or provider-affiliated organization (including a non-profit organization affiliated with the provider) steers people who could receive or are receiving benefits under Medicare and/or Medicaid to enroll in an individual market plan. The potential harm is particularly acute when the steering occurs for the financial gain of the health care provider through higher payment rates without taking into account the needs of these beneficiaries."

197.   The practice of routinely waiving or eliminating patient cost-share obligations only amplifies these harms. Indeed, because members are more likely to complain to their insurers, or alert them to issues regarding the provision of the health care services they are receiving, when they are having to bear the cost of some of their care, eliminating member cost-share obligations is one of the most common tactics adopted by providers to mask and keep members from alerting insurers to larger fraud and abuse schemes the providers are

perpetuating and allow those schemes to proliferate undetected. The systematic elimination of member cost share obligations also disrupts the behavioral incentives inherent in benefit plans designed to control healthcare costs, and can cause costs to increase for everyone.

198.    The widespread harm that can flow from the type of conduct DaVita has been engaged in only makes it more important that DaVita's conduct be remedied and stopped.

## VI.    COUNTS AGAINST DAVITA

### A.    Count I – Breach of Contract

199.    Florida Blue incorporates by reference all preceding paragraphs as if fully set forth herein and further alleges as follows.

200.    Florida Blue has a contract with DaVita consisting of the Provider Agreement and the policies referenced and incorporated therein.

201.    Florida Blue has performed its obligations under the Provider Agreement.

202.    DaVita has breached the Provider Agreement in material ways.

203.    Section 2.1.1.2 of the Provider Agreement requires DaVita and each of its dialysis clinics to, throughout the term of the Agreement, "render Services in compliance with all Laws, this Agreement, the Manual for Physicians and Providers, and [Florida Blue's] policies and procedures."

204.    Section 5.4 of the Provider Agreement states:  "The validity of this Agreement and of any of its terms and provisions, as well as the rights and duties of the parties hereunder, shall be interpreted and enforced pursuant to and in accordance with the Laws of the State of Florida," making Florida's healthcare fraud and abuse laws applicable to DaVita's conduct at issue here.

205.    *First*, DaVita has breached Section 2.1.1.2 of the Provider Agreement by violating Florida's Insurance Fraud Statute, Fla. Stat. § 817.234(1)(a)(1)-(2), (3), (7)(a).

206.    Under Florida's Insurance Fraud Statute, a person commits insurance fraud if that person, with the intent to injure, defraud, or deceive any insurer presents or causes to be presented any written or oral statement as part of, or in support of, a claim for payment or other benefit pursuant to an insurance policy, knowing that such statement contains any false, incomplete, or misleading information concerning any fact or thing material to such claim. Fla. Stat. § 817.234(1)(a)(1).

207.    A person also commits insurance fraud if that person, with the intent to injure, defraud, or deceive any insurer prepares or makes any written or oral statement that is intended to be presented to any insurer in connection with, or in support of, any claim for payment or other benefit pursuant to an insurance policy, knowing that such statement contains any false, incomplete, or misleading information concerning any fact or thing material to such claim. Fla. Stat. § 817.234(1)(a)(2).

208.    Further, a person commits insurance fraud if that person knowingly presents, causes to be presented, or prepares or makes with knowledge or belief that it will be presented to any insurer, any false, incomplete, or misleading information or written or oral statement as part of, or in support of, an application for the issuance of, or the rating of, any insurance policy, or knowingly conceals information concerning any fact material to such application. Fla. Stat. § 817.234(1)(a)(3).

209.    Finally, Florida's Insurance Fraud Statute also states that it shall constitute a material omission and insurance fraud for any service provider, other than a hospital, to

engage in a general business practice of billing amounts as its usual and customary charge, if such provider has agreed with the insured or intends to waive deductibles or copayments, *or does not for any other reason intend to collect the total amount of such charge.* Fla. Stat. § 817.234(7)(a).

210.    Thus, Fla. Stat. § 817.234(7)(a) applies to any instance where a provider, like DaVita, intends to not collect the deductible, copayment, and/or coinsurance owed by a patient pursuant to his commercial insurance plan. The business practices, actions, and deceptive billing conduct described above which DaVita engaged in intending to injure, defraud, and deceive Florida Blue, including: (a) DaVita's use of AKF to fund and pay its patients' Florida Blue premiums (and conceal as much), (b) its billing of Florida Blue coupled with its routine waiver of and decision to not collect Florida Blue members' payment responsibilities, (c) its role in presenting, preparing, and causing to be presented to Florida Blue false, incomplete, or misleading statements or information associated with Florida Blue members' insurance policy applications, and (d) its role in causing insurance claims containing misrepresented, incomplete, and misleading information concerning material facts to be prepared and submitted to Florida Blue, directly violate the provisions of Florida's Insurance Fraud Statute set forth above.

211.    By failing to render services in compliance with Florida's Insurance Fraud Statute, DaVita has breached Section 2.1.1.2 of the Provider Agreement.

212.    *Second,* DaVita has breached Section 2.1.1.2 of the Provider Agreement by violating Florida's Patient Brokering Statute, Fla. Stat. § 817.505 *et seq.* Florida's Patient Brokering Statute prohibits "any person, including any health care provider or health care

facility," from offering or paying "any commission, bonus, rebate, kickback, or bribe, directly or indirectly, in cash or in kind, or engage in any split-fee arrangement, in any form whatsoever, to induce the referral of patients or patronage to or from a health care provider or health care facility[.]" Fla. Stat. § 817.505(1)(a).

213.    It is also unlawful for any person to solicit or receive any commission, bonus, rebate, kickback, or bribe, directly or indirectly, in return for referring patients or patronage to or from a health care provider or health care facility. Fla. Stat. § 817.505(1)(b). It is unlawful for any person to solicit or receive any commission, bonus, rebate, kickback, or bribe, directly or indirectly, in return for the acceptance or acknowledgement of treatment from a health care provider or health care facility. Fla. Stat. § 817.505(1)(c). And it is also unlawful for any health care provider or facility to aid, abet, advise, or otherwise participate in the conduct prohibited under Fla. Stat. § 817.505(a), (b), or (c). Fla. Stat. § 817.505(1)(d).

214.    In violation of Fla. Stat. § 817.505(1)(a), DaVita has offered to pay and has paid remuneration, directly or indirectly, to induce the referral of patients or patronage by (a) agreeing to waive patients' cost-sharing obligations to induce them to enroll in Florida Blue's commercial plans and choose to receive dialysis treatments from DaVita under those conditions, (b) using AKF to provide remuneration to Florida Blue members for their insurance premiums to induce them to enroll in Florida Blue commercial plans and choose to receive dialysis treatments from DaVita under those conditions. DaVita has orchestrated these payments to cover patients' premiums and cost-share obligations to induce patronage by Florida Blue members and create the opportunity to bill Florida Blue at higher and more profitable rates for their dialysis services, to enrich itself.

215.    In violation of Fla. Stat. § 817.505(1)(b), AKF has solicited or received remuneration in return for referring patients and patronage to DaVita by accepting "donations" on behalf of DaVita and then using those "donations" to pay the insurance premiums of patients who enrolled in Florida Blue's commercial plans, ensuring that these members would receive dialysis services at DaVita facilities and become enrolled in, or remain enrolled in, commercial insurance coverage that would allow DaVita to extract higher and more profitable rates for the same services. DaVita has violated Fla. Stat. § 817.505(1)(d) by aiding, abetting, advising, and otherwise participating in AKF's aforementioned prohibited conduct.

216.    DaVita has also violated Fla. Stat. § 817.505(1)(d) by aiding, abetting, advising, directing, controlling, and otherwise participating in conduct described above that violates Fla. Stat. § 817.505(a), (b), and (c).

217.    *Third,* DaVita has breached Section 2.1.1.2 of the Provider Agreement by violating Florida's Anti-Kickback Statute, Fla. Stat. § 456.054.

218.    Florida's Anti-Kickback Statute makes it "unlawful for any health care provider or any provider of health care services to offer, pay, solicit, or receive a kickback, directly or indirectly, overtly or covertly, in cash or in kind, for referring or soliciting patients." Fla. Stat. § 456.054(2). A kickback is remuneration or payment, by or on behalf of a provider of health care services or items, to any person as an incentive or inducement to refer patients for past or future services or items. Fla. Stat. § 456.054(1). "Violations of [section 456.054] shall be considered patient brokering and shall be punishable as provided in [Florida's Patient Brokering Act, Fla. Stat. § 817.505]." Fla. Stat. § 456.054(4).

219.    As described above, DaVita has violated Florida's Anti-Kickback Statute through its actions described above, including its practice of waiving copays and of making payments to and through AKF to pay the insurance premiums of patients eligible for benefits under Medicare or Medicaid. DaVita has done this to solicit and obtain the referral of patients, knowing the payments were likely to influence the patients to purchase, order, arrange for, receive, or continue receiving, dialysis services from DaVita, and to enroll in, or remain enrolled in, the insurance plans DaVita coveted that pay DaVita higher rates.

220.    By failing to render services in compliance with Florida's Anti-Kickback Statute, DaVita has also violated Florida's Patient Brokering Statute, and has independently breached Section 2.1.1.2 of the Provider Agreement.

221.    *Fourth,* DaVita has separately breached Section 2.1.1.2 of the Provider Agreement by violating Florida's Deceptive and Unfair Trade Practices Act ("FDUTPA"), Fla. Stat. § 501.201, *et seq.*, by engaging in the host of unfair, deceptive, and abusive practices described herein and in more detail below.

222.    *Fifth,* DaVita has also breached Schedule A of the Provider Agreement which states that DaVita "shall not waive, discount or rebate any such deductible, coinsurance, and/or copayment amounts without the prior written consent of Florida Blue except for demonstrated hardship and following a documented process to collect applicable deductibles, coinsurance and copayments." As discussed above, DaVita routinely waived Florida Blue members' deductibles, coinsurance and copayment requirements in furtherance of its scheme.

223.    As a direct and proximate consequence of DaVita's conduct and material breaches of the Provider Agreement, Florida Blue has been harmed by paying DaVita amounts it would not have paid but for DaVita's breaches.

224.    By virtue of the foregoing, Florida Blue is entitled to compensatory damages.

**B.     Count II – Breach of the Implied Covenant of Good Faith and Fair Dealing**

225.    Florida Blue incorporates by reference paragraphs 1-223 (specifically including the allegations contained in Count I) as if fully set forth herein and further alleges as follows.

226.    Every contract, including the Provider Agreement, contains in it an implied covenant of good faith and fair dealing.

227.    Under the Provider Agreement, Florida Blue reasonably expected to receive certain benefits, including to have DaVita's services made available to (and only have to pay benefits for) Florida Blue members who enrolled or chose to stay enrolled in Florida Blue's plans through their own volition and satisfied their plan obligations, not members who DaVita improperly manipulated, steered, and induced to enroll (or stay enrolled) in the plans, including by paying their premiums and/or eliminating their cost-sharing obligations, and by utilizing other methods to manipulate and steer patients described above.

228.    DaVita breached the implied covenant of good faith and fair dealing by engaging in conduct designed to interfere with Florida Blue's right to receive those benefits and take advantage of its contractual relationship with Florida Blue so it could get paid greater sums. DaVita specifically breached the implied covenant of good faith and fair dealing by engaging in misconduct designed to steer and induce members to stay off of

61

Medicare or Medicaid as primary insurance and enroll or stay enrolled in Florida Blue's plans, so DaVita could reap more payments under the Provider Agreement from DaVita than it otherwise would have received.

229.    In engaging in this misconduct, DaVita acted consciously, deliberately, and in bad faith, frustrating the purpose of the Provider Agreement and Florida Blue's reasonable expectations.

230.    As a direct and proximate consequence of DaVita's breaches, Florida Blue has been harmed, by paying DaVita amounts it would not have paid but for DaVita's breaches.

231.    By virtue of the foregoing, Florida Blue is entitled to compensatory damages.

**C.     Count III – Tortious Interference with Contract**

232.    Florida Blue incorporates by reference paragraphs 1-198 as if fully set forth herein and further alleges as follows.

233.    DaVita's conduct constitutes wrongful interference with Florida Blue's contractual relationships.

234.    Each of the Florida Blue members for whom DaVita submitted claims and received payment from, Florida Blue received healthcare benefits pursuant to a benefit plan insured and/or administered by Florida Blue.

235.    The terms of members' benefit plans were set forth in individual contracts between the members and Florida Blue.

236.    Many of these contracts contained provisions that explicitly required that members to pay their premiums in order to obtain and maintain their insurance coverage.

237.    These contracts also contained provisions that required members to satisfy their cost-sharing obligations associated with healthcare services they received, including their deductibles, coinsurance obligations, and any copayments, by making those payments to their providers.

238.    Having counseled its patients to enroll in, or remain enrolled in, Florida Blue's commercial plans, DaVita knew, or reasonably should have known, that those plans required Florida Blue members to pay their own premiums as well as their cost-sharing responsibilities.

239.    Despite this knowledge, DaVita intentionally interfered with, attempted to defeat, and procured the breach of members' contracts by waiving or failing to collect their required payment responsibilities and by coordinating with and using AKF to pay members' required premiums.

240.    DaVita's interference and procurement of these breaches was without justification or privilege.

241.    The breaches DaVita caused have resulted in significant damages to Florida Blue in the form of unnecessary payments Florida Blue made to DaVita subsequent to and as a result of those breaches.

242.    By virtue of the foregoing, Florida Blue is entitled to an award of compensatory damages together with interest and costs, injunctive relief, and any other relief the Court deems just and proper.

**D.      Count IV – Fraud**

243.    Florida Blue incorporates by reference paragraphs 1-198 as if fully set forth herein and further alleges as follows.

244.    DaVita knowingly and willfully executed a scheme to defraud Florida Blue by submitting fraudulent claims for dialysis services rendered to Florida Blue members.

245.    DaVita had an independent duty to submit honest, accurate, and complete claims that did not misrepresent, disregard, or conceal any facts material to Florida Blue's decision about whether the claims were payable, and, if so, in what amount.

246.    DaVita also had an independent state law duty to disclose certain material facts relating to the claims it was submitting to Florida Blue, including the facts that it was secretly and systematically funding Florida Blue's members' premiums (using AKF as a conduit to do so), and that it was secretly and systematically waiving or choosing to not collect Florida Blue's members' cost-sharing obligations. This duty is not only imposed by Fla. Stat. § 817.234, it also arises from the facts that: (a) as one party to the claims transactions, DaVita could have disclosed material facts that would have prevented its claims submissions from misleading Florida Blue, and (b) DaVita had special, unique possession and knowledge of these material facts, which Florida Blue had no access to and could not discover by ordinary observation.

247.    In submitting and causing to be submitted claims to Florida Blue, DaVita misrepresented material facts in several respects.

248.    *First*, in submitting the claims, DaVita told Florida Blue to reimburse it for the charges contained in the claims and represented that it was entitled to be paid on those

charges, knowing that it was not entitled to be paid on those charges, and that the claims were also tainted by conduct that violated the Florida healthcare fraud and abuse statutes described above.

249.    *Second*, in submitting the claims, DaVita untruthfully represented and certified that the claims were true, accurate, and complete, and that it had not knowingly or recklessly disregarded, misrepresented, or concealed material facts. In reality, DaVita billed Florida Blue charges that it knew were not payable while knowingly or recklessly disregarding and concealing the material facts that it had been providing Florida Blue members with free Florida Blue insurance (by systematically paying their premiums) and free dialysis (by failing to collect their cost-sharing obligations).

250.    *Third,* in submitting the claims, DaVita affirmatively concealed and failed to disclose the fact that it was paying the Florida Blue members' insurance premiums. As described above, DaVita used the AKF as a conduit through which to pay its patients' premiums, and specifically to *conceal* the fact that DaVita itself was paying those premiums from insurers like Florida Blue. DaVita used AKF as a pass-through intermediary to "wash" itself off as the apparent source of its patients' premium payments, when in fact DaVita was funneling massive, proportional sums through AKF to correspond to the amounts of premium payments it believed its patients would need.

251.    Upon information and belief, and based on publicly available information, DaVita employees appear to have been able to log into and use AKF's online Grants Management System to take actions that would cause premium payment checks to go out to DaVita's own patients. DaVita then submitted claims to Florida Blue while fraudulently

concealing and failing to disclose that it was paying Florida Blue members' premiums, or the true nature of its financial arrangement with AKF.

252.     *Fourth*, in submitting the claims, DaVita failed to disclose that it was systematically waiving and failing to collect Florida Blue's members' cost-sharing obligations.

253.     The information DaVita misrepresented and concealed was material to Florida Blue's determination of whether to pay the claims and, if so, in what amount.

254.     At the time DaVita made its misrepresentations, DaVita knew they were misleading and false.

255.     DaVita also knew that it was concealing and omitting material information, that the material information should be disclosed and not concealed, and that its conduct would induce Florida Blue to make payments on the claims to DaVita.

256.     DaVita submitted and caused to be submitted the claims to Florida Blue with the intent to defraud Florida Blue by inducing Florida Blue to rely on the misrepresented and concealed material facts and pay the claims based on the charges contained therein.

257.     In so doing, DaVita acted in bad faith.

258.     Florida Blue reasonably and justifiably relied on DaVita's material misrepresentations, concealments, and omissions in paying the false, inaccurate, incomplete, and misleading claims, and, as a direct and proximate result of DaVita's conduct, suffered compensable injury. Florida Blue has been harmed by paying DaVita amounts that would not have been paid had Florida Blue known of DaVita's misrepresentations, and that are far in excess of what should have been paid.

259.    By virtue of the foregoing, Florida Blue is entitled to injunctive relief, compensatory damages, including consequential damages, punitive damages, interest and costs, and any other relief the Court deems just and proper.

      **E.      Count V – Negligent Misrepresentation**

260.    Florida Blue incorporates by reference paragraphs 1-198 as if fully set forth herein and further alleges as follows.

261.    DaVita misrepresented material facts in connection with the claims it submitted to Florida Blue.

262.    DaVita either knew the misrepresentations it made were false, made them without knowledge of their truth or falsity, or made them under circumstances in which DaVita ought to have known of their falsity.

263.    Specifically, DaVita misrepresented that the charges contained in the claims were payable, that the claims were true, accurate, and complete, and that it had not knowingly or recklessly disregarded, misrepresented, or concealed material facts, as described above.

264.    DaVita intended to induce Florida Blue to act on these misrepresentations and pay amounts on the charges contained in the claims DaVita submitted. Florida Blue justifiably relied on DaVita's misrepresentations in processing and paying the claims, and suffered pecuniary loss as a result.

265.    By virtue of the foregoing, Florida Blue is entitled to compensatory damages and injunctive relief.

### F.      Count VI – Civil Conspiracy

266.    Florida Blue incorporates by reference paragraphs 1-198 as if fully set forth herein and further alleges as follows.

267.    DaVita has conspired with AKF to unlawfully procure funds from Florida Blue through fraud, negligent misrepresentation, and tortious interference with Florida Blue's plan provisions.

268.    In order to accomplish these unlawful acts, DaVita and AKF have conspired to calculate, and have DaVita make, large "charitable donations" to AKF, which AKF would then direct, or allow DaVita to direct, to pay DaVita's patients' insurance premiums so those patients would enroll or remain enrolled in Florida Blue commercial plans. This was done so DaVita could collect increased payments from those plans and so that AKF could receive larger additional "charitable donations" from DaVita. DaVita and AKF understood that by acting in concert, they could both benefit: DaVita would be able to increase revenues and profits, and AKF would be able to maintain or increase the massive "donations" it was receiving, to further perpetrate the scheme.

269.    The overt acts DaVita and AKF have taken to perpetuate the scheme are described above and in the Counts for fraud and tortious interference. They include: (a) DaVita and AKF working together to concoct core elements of the scheme and then calculating and making massive "donations" to AKF that corresponded to DaVita's understanding of how much premium payment money its patients would need, (b) DaVita "steering" patients into, or keeping patients on, Florida Blue commercial plans by telling them AKF would pay their premiums, (c) DaVita employees filling out and submitting

patient "grant" applications to AKF, (d) AKF approving these applications, oftentimes in violation of AKF's own policies, (e) AKF allocating sums that had been "donated" by DaVita to be distributed back to DaVita's patients in amounts necessary to pay their premiums, (f) DaVita and AKF taking action within AKF's GMS system and other actions to cause premium payments to go to DaVita's patients, (g) DaVita and AKF engaging in this conduct despite knowing that Florida Blue's plans required members to pay their own premiums, and (h) DaVita submitting claims to Florida Blue while concealing and without disclosing that it, through AKF, was paying the premiums of Florida Blue's members and while concealing and without disclosing that it was not collecting Florida Blue member cost-sharing obligations.

270.    DaVita and AKF also possess a peculiar power of coercion when acting in unison that they would not have had they acted alone. Specifically, by acting in unison, DaVita and AKF are able to facilitate DaVita's payments of its patients' insurance premiums all while concealing the mechanics of that payment system and DaVita's involvement in it from Florida Blue. This allows them to defeat the provisions of Florida Blue's plans, bill Florida Blue, and extract substantial payments from Florida Blue, while evading detection.

271.    The concerted actions of DaVita and AKF have proximately caused Florida Blue to suffer significant damages.

272.    Accordingly, Florida Blue is entitled to compensatory damages, interest and costs, and an injunction prohibiting Florida Blue from continuing to engage in the conduct described herein.

G.   **Count VII – Violation of Florida Unfair and Deceptive Trade Practices Act, Fla. Stat. § 501.201,** *et seq.*

273.   Florida Blue incorporates by reference paragraphs 1-198 as if fully set forth herein and further alleges as follows.

274.   DaVita is, and has been, engaged in trade and commerce in the State of Florida.

275.   DaVita has sought to specifically harm Florida consumers in the execution of their deceptive and fraudulent scheme.

276.   Florida Blue and its members are consumers under FDUTPA. *See* Fla. Stat. § 501.203(7).

277.   Florida Blue has been injured by DaVita's unfair or deceptive practices in the course of buying and paying for medical services that DaVita rendered unlawfully and sold in the State of Florida.

278.   DaVita's business practices constitute both *per se* and traditional violations of FDUTPA.

279.   DaVita's acts and practices constitute *per se* FDUTPA violations because they violate statutes that proscribe unfair methods of competition and unfair, deceptive, or unconscionable acts or practices, including Fla. Stat. § 817.234 (prohibiting false and fraudulent insurance claims), Fla. Stat. § 817.505 (prohibiting patient brokering), and Fla. Stat. § 456.054 (prohibiting kickbacks), as described above.

280.   DaVita's unlawful acts and practices affected many claims for services rendered in Florida and have caused significant economic harm to Florida Blue because they

have caused Florida Blue to make substantial benefits payments to, and inuring to the benefit of, DaVita, that Florida Blue was not obligated to make.

281. DaVita's acts and practices also constitute traditional violations of FDUTPA.

282. DaVita engaged in unfair methods of competition, unconscionable, unfair, and deceptive acts and practices in the conduct of trade or commerce when it used the misconduct described herein to target, steer, induce, and enroll vulnerable patients into the plans it coveted and deceive Florida Blue in connection with those efforts and the unlawful and unpayable claims it submitted for dialysis services rendered to the Florida Blue members.

283. As described herein, after using a host of unfair and deceptive methods to steer, induce, and enroll vulnerable patients into treat at DaVita while enrolled in the plans DaVita coveted, DaVita continued to deceive Florida Blue in connection with the claims it submitted or caused to be submitted in order to extract maximum sums. DaVita falsely represented that the charges it submitted were payable and due and that it had not knowingly or recklessly disregarded, misrepresented, or concealed material facts, when it had. DaVita also concealed and failed to disclose the fact that it had targeted, steered, and often enrolled patients into Florida Blue's plans for its own financial gain, the nature and operation of the premium payment and financial arrangement DaVita had with the AKF, and the fact that it was funneling premium payment money to its Florida Blue member patients through and in cooperation with the AKF, and waiving or otherwise eliminating patients' deductibles, coinsurance, and other cost-sharing obligations. DaVita concealed and failed to disclose this

material information despite having special, unique possession of and access to it, and despite having a duty to do so to prevent Florida Blue from being misled.

284.    DaVita engaged in the conduct described above, concealed material facts, and billed Florida Blue in a deceptive, false, and misleading way to deceive Florida Blue into making payments it otherwise would not have made.

285.    DaVita's unfair trade practices and deceptive acts that comprised its inappropriate steering and billing scheme misled Florida Blue to its detriment and caused Florida Blue to make substantial payments to, and that directly benefitted, DaVita that, unbeknownst to Florida Blue, were not owed and would not have been paid but for DaVita's conduct. Florida Blue has retained the undersigned firm to represent it in this action and is entitled to recover its attorney's fees pursuant to the provisions of Fla. Stat. § 501.2105 and Fla. Stat. § 501.211(2).

286.    In addition to authorizing damages, FDUTPA authorizes declaratory and injunctive relief for violations of its provisions. *See* Fla. Stat § 501.211(1).

287.    By virtue of the foregoing, and consistent with the provisions of Fla. Stat. § 501.211, Florida Blue seeks damages for benefits paid on the unlawful and deceptive claims DaVita submitted to Florida Blue, plus attorney's fees, costs, and interest; a declaratory judgment declaring that DaVita's acts and practices are unfair and deceptive and in violation of FDUTPA; an order enjoining DaVita from continuing to engage in such unfair and deceptive acts and practices; and any other relief the Court deems just and proper.

### H.      Count VIII – Unjust Enrichment

288.     Florida Blue incorporates by reference paragraphs 1-198 as if fully set forth herein and further alleges as follows.

289.     Florida Blue has conferred direct benefits on DaVita in the form of significant payments based on claims DaVita submitted for dialysis services rendered to patients enrolled in Florida Blue plans, to which DaVita was not entitled, and DaVita has knowledge of those benefits.

290.     DaVita has received a direct benefit from those payments.

291.     DaVita has voluntarily accepted and retained the payments it has received and other associated benefits conveyed by Florida Blue.

292.     Under the circumstances of this case, as set forth herein, it would be unjust and inequitable for DaVita to retain those payments and benefits that it received.

293.     The money DaVita has received from Florida Blue belongs in equity and good conscience to Florida Blue.

294.     By virtue of the foregoing, Florida Blue is entitled to recover the substantial amount of payments DaVita has improperly retained, which Florida Blue estimates to be to the tune of tens of millions of dollars.

## VII.   PRAYER FOR RELIEF

WHEREFORE, Florida Blue respectfully requests an award in its favor and granting the following relief:

a.      An award of compensatory damages, including actual damages, as requested herein;

b.      An award of punitive damages as requested herein;

c.      Declaratory and injunctive relief as requested herein;

d.      An award of attorneys' fees and costs as requested herein;

a.      Prejudgment and post-judgment interest; and

b.      An award of any other relief the Court deems just and proper.

Dated: May 14, 2019                          Jeffrey S. Gleason (Minn. Bar #396190)[3]
                                             Jamie R. Kurtz (Minn. Bar #391792)
                                             William Bornstein (Minn. Bar #0392098)
                                             Chelsea A. Walcker (Minn. Bar # 0396792)
                                             ROBINS KAPLAN LLP
                                             2800 LaSalle Plaza
                                             800 LaSalle Avenue
                                             Minneapolis, MN 55402-2015
                                             T: (612) 349-8500
                                             F: (612) 339-4181
                                             jgleason@robinskaplan.com
                                             jkurtz@robinskaplan.com
                                             wbornstein@robinskaplan.com
                                             cwalcker@robinskaplan.com


                                             By: s/ Michael A. Abel
                                             Michael A. Abel
                                             Florida Bar No. 0075078
                                             Jackie A. Van Laningham
                                             Florida Bar No. 1003168
                                             ABEL BEAN LAW, P.A.
                                             50 North Laura Street, Suite 2500
                                             Jacksonville, Florida 32202
                                             Telephone: (904) 516-5486
                                             mabel@abelbeanlaw.com
                                             jvanlaningham@abelbeanlaw.com


                                             *Trial Counsel for Plaintiffs*

---

[3] In accordance with Local Rule 2.02, Jeffrey S. Gleason, Jamie R. Kurtz, William Borstein and Chelsea A. Walcker will be filing a written motion, as well as a designation and consent to act with fourteen (14) days.