# UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF FLORIDA
### JACKSONVILLE DIVISION

BLUE CROSS AND BLUE SHIELD OF
FLORIDA, INC., and HEALTH OPTIONS,
INC.,

                                             CASE NO.: 3:19-cv-574-J-39MCR

       Plaintiffs,

v.

DAVITA, INC. f/k/a DAVITA HEALTHCARE
PARTNERS INC.,

       Defendant.

_____

## PLAINTIFFS' MOTION FOR PARTIAL SUMMARY JUDGMENT

Plaintiffs Blue Cross and Blue Shield of Florida, Inc. and Health Options, Inc. (collectively, "Florida Blue") respectfully submit as follows in support of their Motion for Partial Summary Judgment.

## INTRODUCTION

The record at the close of discovery establishes beyond reasonable dispute that DaVita, Inc. (1) breached its contract with Florida Blue; (2) breached the implied covenant of good faith and fair dealing; (3) caused Florida Blue's insureds to breach *their* contracts with Florida Blue; and (4) violated the Florida Deceptive and Unfair Trade Practices Act ("FDUTPA"). In doing so, DaVita bilked Florida Blue out of $95 million. Florida Blue is thus entitled to summary judgment on its claims for breach of contract, breach of implied covenant of good faith and fair dealing, tortious

1

interference, and FDUTPA.

DaVita is one of the largest dialysis providers in the nation. Many of its patients suffer from end-stage renal disease ("ESRD"), which requires dialysis treatment indefinitely. Virtually all ESRD patients are eligible to receive highly subsidized or free health insurance from the federal government through Medicare or Medicaid, and most do. But because governmental insurance pays far less than commercial insurance, DaVita relies on the minority of ESRD patients who are privately insured for nearly all of its profits.

Florida Blue was, until late 2019, one of the private insurers upon which DaVita relied for its bottom line. DaVita entered into a provider agreement with Florida Blue in 2014, under which Florida Blue agreed to pay DaVita at rates far higher than Medicare or Medicaid. In return, DaVita agreed to abide by all applicable state laws in serving Florida Blue insureds, and to collect the amounts Florida Blue's insurance plans require its members to pay for their own care absent "demonstrated hardship and following a documented process to collect applicable deductibles, coinsurance and copayments." Declaration of Jeffrey S. Gleason ("Gleason Decl."), Ex. 1 at 154.

DaVita breached that contract before the ink was dry in pursuit of windfall profits. In 2014, DaVita instituted its ███████████████ initiative, through which it sought to steer as many individuals as possible away from governmental insurance and into commercial health insurance plans. DaVita employed insurance counselors and social workers to "educate" individuals who had or were eligible for

governmental insurance on their options—*i.e.*, to preach the benefits of commercial insurance. DaVita "educated" these patients regarding fictitious advantages of commercial plans, omitted drawbacks and alternatives, and ultimately steered roughly ███ of them into Florida Blue insurance plans. Florida Blue was now responsible not only for the patients' dialysis claims but all health care claims these patients incurred.

For the patients it convinced to enroll in commercial insurance, DaVita faced an additional hurdle: commercial health insurance is far more expensive than governmental insurance. The patients frequently could not (or did not want to) pay the higher premiums and cost-sharing obligations associated with commercial insurance, and Florida law prohibited DaVita from covering those costs itself. Accordingly, DaVita enlisted the American Kidney Fund ("AKF")—a charity, not to be mistaken with the long-standing National Kidney Foundation, that pays the insurance premiums of ESRD patients through its Health Insurance Premium Program ("HIPP")—to conceal its payments. DaVita agreed to "donate" its "fair share" into AKF's HIPP fund, in return, AKF routed DaVita's "donations" to pay the commercial insurance premiums of DaVita patients ███████████████████. DaVita's documents show ██████████████████████████████████████████████████. This covert arrangement violated Florida law and the parties' contract.

Having found a way to pay the premiums of its patients, DaVita faced yet another impediment: its contractual agreement to collect the amounts Florida Blue

members owed for their own treatment under their insurance plans. To keep patients enrolled in Florida Blue plans and treating at its facilities, DaVita simply ignored its contract with Florida Blue and systematically waived the cost-sharing obligations of the Florida Blue members at issue. Its own documents show that, ████████ ████████████████████████████████████████████████████. By systematically waiving virtually all cost-sharing obligations of Florida Blue members, DaVita again violated Florida law and its contract with Florida Blue.

Florida Blue ultimately paid $95 million more in claims for the individuals DaVita ██████████████████████████████████████████████ ██████████████████████████████████████. Florida Blue paid these amounts as a direct result of DaVita's tortious conduct. The undisputed facts establish as a matter of law that Florida Blue is entitled to recoup these amounts from DaVita.

## STATEMENT OF UNDISPUTED MATERIAL FACTS

### A. DaVita and Florida Blue entered into an Ancillary Provider Agreement.

Florida Blue is a leading provider of health insurance in Florida. On January 1, 2014, Florida Blue and DaVita entered into an Ancillary Provider Agreement to provide dialysis services for Florida Blue members. Gleason Decl., Ex. 1. The Agreement was effective until DaVita terminated the Agreement in 2018. *Id.*, Ex. 2 at 14:13-18, 119:2-12. Section 2.1.1.2 of the Agreement required, at all relevant times, that DaVita and each of its dialysis clinics, throughout the term of the Agreement, "render Services in compliance with all Laws, this Agreement, the

Manual for Physicians and Providers, and [Florida Blue's] policies and procedures." *Id.*, Ex. 1 at 101. Schedule A of the Agreement provided that DaVita "shall not waive, discount or rebate any such deductible, coinsurance, and/or copayment amounts without the prior written consent of [Florida Blue] except for demonstrated hardship and following a documented process to collect applicable deductibles, coinsurance and copayments." *Id.* at 154.

### B. Florida Blue's contracts with its members

Florida Blue offers and/or administers various types of commercial health insurance plans, including those offered on the health insurance exchange pursuant to the ACA as well as Employer Group Health Plans (EGHPs) and COBRA plans. ECF No. 2 ¶ 60. The individuals who have enrolled in these plans are referred to as "members" and each plan sets forth obligations for the members to pay for some portion of the insurance coverage they purchase and the cost of the healthcare services they receive from their providers. *See e.g.*, Gleason Decl., Ex. 3 at 4062. Florida Blue's commercial plans require members to purchase the plan coverage and benefits by paying a monthly premium. *Id.* For example, Florida Blue's BlueOptions, Platinum 1424 Plan defines "premium" as "the total amount required to be paid by the [member] to [Florida Blue] in order to be covered under this Contract." *Id.* at 4117. The plan also states that "to be eligible to apply for coverage as a [member], [they] must: . . . pay the required [p]remiums." *Id.* at 4064. Further, Florida Blue's plans require that members pay their own premiums. *Id.* at 4062. Exemplar plan language between 2014 and 2019 states that members, "as the Contractholder, are

5

solely responsible for submitting the Premium . . . by the end of the . . . [p]eriod." *Id.*

Florida Blue's plans also require members to pay cost-sharing obligations for all or a portion of the services they receive from a healthcare provider. *See id.*, Ex. 3. Typically, members' cost-sharing obligations consist of three components: (1) a deductible, (2) a coinsurance amount, and (3) a fixed copay. *Id.* A deductible is a dollar amount a member must pay each calendar year for the healthcare services they receive before their insurance company begins to pay for certain health services. *Id.* at 4105; Ex. 4 at 47:22-25; Ex. 5 at 44:3-8; Ex. 6 at 47:11-20. Florida Blue's plan provisions make it clear that Florida Blue's obligation to pay claims to any provider is not triggered until a member actually pays their required deductible amounts. *Id.* at 4105. For example, Florida Blue's BlueOptions, Platinum 1424 Plan, defines "deductible" as "the amount of charges, up to the Allowed Amount, for Covered Services that [a member] must actually pay each Calendar Year to an appropriate licensed health care Provider, who is recognized for payment under this Contract, before [Florida Blue's] payment for Covered Services begins." *Id.*, Ex. 3 at 4105.

Once members have paid their deductibles, Florida Blue's plans generally also require members to pay coinsurance for the healthcare services they receive, until they meet the annual "out of pocket" maximum set forth in the plans. *See id.*, Ex. 3. Coinsurance is the percentage of costs of a covered service that members pay (e.g., 20% of allowed amounts) after paying their deductible. *See id.* at 3980; Ex. 4 at 48:1-10; Ex. 5 at 44:9-45:5; Ex. 6 at 47:21-48:9. For example, Florida Blue's BlueOptions, Platinum 1424 Plan defines "coinsurance" as the "sharing of health care expenses for

6

Covered Services between [the member] and [Florida Blue]. After [the member's] Deductible is met, [Florida Blue] will pay a percentage of the Allowed Amount for Covered Services, as listed in the Schedule of Benefits." *Id.* at 4102.

Finally, Florida Blue's plans sometimes require members to pay modest, fixed dollar amounts called "copays" at the time they receive certain healthcare services after their deductible is paid. *See id.*, Ex. 3 at 4103; Ex. 5 at 48:11-16; Ex. 6 at 48:10-16. For example, Florida Blue's BlueChoice, Platinum 1424 Plan defines "copayment" as "the dollar amount established solely by [Florida Blue] which [the member] must pay to a health care Provider at the time Covered Services are rendered by that Provider." *Id.* at 4103.

### C. DaVita engaged in an unlawful scheme to steer patients onto commercial insurance plans.



Since at least 2014, DaVita ███████████████████████████████ ███████████████████████████████████████████████ ████████████████████████. *Id.*, Exs. 7 at 10618-19; 8. Nearly every ESRD patient is eligible for governmental insurance simply by virtue of that diagnosis.[1] And nearly every dialysis patient chooses such comprehensive and affordable coverage.[2] But DaVita makes ███████████████████████ ████████████████████████████████. *Id.*, Exs. 7 at 10619; 13. Convincing a single patient to switch from a government plan to a commercial

---

[1] https://www.medicare.gov/media/4416
[2] https://www.kidney.org/atoz/content/insurance-options

plan can result in ███████████████████████████████. *Id.*

Recognizing the staggering profits that would flow from mass conversion of its patient population, DaVita implemented its ██████████████ initiative, the goal of which was to ████████████████████████████ ███████████████████████████. *Id.*, Exs. 9-11. ████████████████████████████ ████████████████████████████ ████████████████████████████████ *Id.*, Ex. 12. ████████████████████████████████ ████████████████████████████ ████████████ *Id.* ████████████████████ ████████████████████████ *Id.*

DaVita made plans to █████████████████████ ████████████████████████████████ ████████████████████████ *Id.*, Ex. 13. By convincing patients to enroll in private Florida Blue coverage, DaVita stood to receive significantly higher payment for rendering the same dialysis services. *See id.* DaVita estimated that by causing ██████████████████ ████████████████████████. *Id.*, Ex. 7 at 10619.

DaVita utilized ████████████████████████

█████████████████████████████████████████████

████████████████████████████████████. *Id.*, Ex. 10. DaVita defined

███████████████████████████████████████████████

██████████████████████████████████████████████████████████

██████. *Id.*, Ex. 14 at 2431. ███████████████████████████████

███████████████████████████████████████████████████████████

█████████████████████████████████████████████ *Id.*, Ex. 10. In

another email, he again stresses the benefit of preparing █████████████████████

██████████████ █████████████████████████████████

█████████████████████████████ *Id.*, Ex. 15.

    DaVita understood that ████████████████████████████

██████████████████████████████████████████

████████████████████. *See id.*, Exs. 10; 15. DaVita entrusted the education of

its patients ████████████ █████████████████████████████████████

██████████████████████████. *Id.*, Ex. 5 at 42:17-21, 82:9-22, 84:5-23; Ex. 6 at

47:1-4, 56:23-57:18; Ex. 16 at 105:5-107:2, 108:7-13; Ex. 17 at 13:18-14:17. Its

████████████████████ relied exclusively on r██████████████████████████

███████. *Id.*, Ex. 17 at 39:6-12. DaVita thus armed its █████████████ with

█████████████████████████████████████████████████

█████████████████████████████████████████. *Id.*, Ex. 16 at

178:7-16; Ex. 18. Those materials typically conveyed ████████████████████████

███████████████████████████████. *Id.*, Ex. 18. █████████████████████

were taught to emphasize the purported benefits of commercial insurance to their

patients, including, among others, ███████████████████████████

█████████████████████████████████████████████████████

██████████████████████████████████████. *Id.*, Exs. 18-19.

**D. DaVita paid patients' commercial plan premiums with AKF funds.**

DaVita knew that enrolling patients in commercial insurance plans would

███████████████████. *See id.*, Ex. 4 at 109:21-110:12. However, DaVita also

understood ████████████████████████████████████████████

███████████████████████████████████. *Id.*, Ex. 40. Because

these patients, who would qualify for low-cost Medicare and/or Medicaid coverage,

often could not afford the premiums owed under the plans, █████████████████

█████████████████████████████████████████████████

████████████████████. *See id.*, Ex. 4 at 109:21-110:12; Ex. 5 at

267:2-5. In an email exchange about whether to use ███████████████████

█████████████████████████████████████████████████████

█████████████████████████████████████████████████████

█████████████████████████████████████████████████████

█████████████████████████. *Id.*, Ex. 20. DaVita's

documents produced in discovery establish that ███████████████████████

█████████████████████████████████████████████████████

██████████████████████. *Id.*, Exs. 21-22; *see also* ECF No. 110 at 5-8.

AKF operated its HIPP Fund, ostensibly a fund that would receive

██████████████████████████████████████████████████████

███████████████████████████████████ *Id.*, Ex. 23 at 11663-665.

But in reality, AKF worked very differently. AKF limited access to premium

assistance to patients of providers who ███████████████ *Id.*, Exs. 25-26. In

a letter sent to ████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████ *Id.* In 2014, AKF's HIPP

Guidelines described AKF's ██████████████ *Id.*, Ex. 23 at 48636. In that

section, AKF instructed that ████████████████████████████████

████████████████ *Id.* AKF also wrote that ███████████████

████████████████████████████████

████████████████ *Id.* And AKF told ███████████████

████████████████████████████████

██████████████████████████ *Id.*

DaVita took heed of AKF's warning and used ████████████

████████████████████████████████

████████████████████████████████

████████████████████████████████

██. *Id.*, Exs. 21-22. Akin to a vendor-vendee relationship, ███████████

████████████████████████████████

████████████████. *See id.* DaVita maintained ███████████

████████████████ *Id.*, Ex. 27. ████████████████

11

█████████████████████████████████████████████████

████████████████████████████████████████████ *Id.*,

Ex. 28 at 44-45. DaVita's documents confirm as much: ████████████

███████████████████████████████████████████████

███████████████████ *Id.*, Ex. 27. These ███████████ also show that, ████████

████████████████████████████████████████████

████████████████████████████████████ . *See id.*, Ex. 21

████████████████████ tab). Likewise, DaVita would ████████████████████████

██████████████████████████████████████ . *Id.*, Ex. 28 at

158:15-160:22.

    Rather than charitable contributions, DaVita ███████████████████████

████████████████████████████████████████████ *Id.*,

Ex. 29. Indeed, the precision with which DaVita calculated its payments to AKF

shows how DaVita ████████████████████████████████████████

██████████████████ Both AKF and DaVita communicated with one another about

███████████████████████████ . *See id.*, Exs. 30-35. Emails produced by

DaVita indicate that the ████████████████████████████████

████████████████████████████████████████████████

████████████████ *Id.*, Ex. 30. Indeed, DaVita employees would monitor their ████████

███████████████████████████████████████████

███████████████████ . *Id.*, Ex. 31. And AKF's CFO would email

DaVita employees asking if DaVita ████████████████████████████████████

██████████████████. *Id.*, Ex. 32. Relatedly, DaVita maintained an accounting

category it called the ████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████████

█████████████████████████ *Id.*, Ex. 34. On another occasion she asked AKF about

███████████████████████████ *Id.*, Ex. 35. ██████████████

████████████████████████████████████████

███████████████████████████████████████. *Id.*, Ex.

36 at 98:6-18; 99:4-15.

For its role in making the ██████████████████████

█████████████████████████ *Id.*, Ex. 37. This fee further illustrates

this is more akin to a █████████████████████████

████████████ AKF's Director of Financial Analysis explained the mechanics of ███

████████████████████████████████████████

██████████████████████████████████████

████████. *Id.* To make the point crystal clear, he wrote, █████████████████

████████████████████████████████████████

███████████████████████████ *Id.* Also in this exchange, AKF's Director

of Financial Analysis provided even more clarity of how the █████████████████

████████████████████████████████████████

██████████████████████████████████████

██████████████████████████████████

13

██████████████████████████████████████████████ *Id.*

    DaVita, through its insurance counselors and social workers, ████████████

████████████████████████████████████████████ One DaVita

insurance counselor testified that she informed patients that the ████████████

███████████████████████████████████████████████████

████████████████████████████████████████████. *Id.*,

Ex. 17 at 24:24-25:19. To ensure that its patients would receive HIPP assistance,

███████████████████████████████████████████████

████████████████████████████████████████

██████████████████████████████████████████████████

████████████████████████████████████. *Id.*, Exs. 34-35.

    In 2016, DaVita specifically quantified how much ████████████████████

████████████████████████████. DaVita's analysis concluded

that, ████████████████████████████████████████

████████████████████

      ■ ████████████████████████████████████████

          ████████████████████

      ■ ████████████████████████████████████████

          ████████████ *See id.*, Ex. 40 at 65181.

**E. DaVita did not collect patients' deductible and coinsurance obligations.**

    As discussed above, Florida Blue's contracts with its insureds required them to

bear a portion of the cost of their care in the form of deductibles and coinsurance. *See*

supra pp. 5-7. DaVita witnesses knew ███████████████████████████

█████████████████████████████████████████████████████████████

██████████████████████████████. *See id.*, Ex. 4 at 47:22-25; Ex. 5 at 43:22-

45:5; Ex. 6 at 47:11-20; Ex. 41 at 248:21-25. Relatedly, the Agreement between

Florida Blue and DaVita required DaVita to collect these amounts with limited

exceptions. *See* Ex. 1 at 154.

      DaVita acknowledged that patients' cost-sharing obligations would represent a

██████████████████████████████████████████████████. *Id.*,

Exs. 42-44. Accordingly, ████████████████████████████████

██████████████████████████████████████████████████. *See*

*id.* It thus systematically waived their cost-sharing obligations.

      In Florida Blue's Interrogatories 12 and 13, Florida Blue requested DaVita

"[i]dentify each instance when you collected any deductible amount from any

member at issue" and "[i]dentify each instance when you collected any coinsurance

amount from any member at issue." *Id.*, Ex. 45. In response, DaVita provided a

█████████████████████████████████████████████████

████████████████████. *See id.*, Ex. 41 at 241:11-20; Exs. 45-46. ████████

█████████████████████████████████████████████████

█████████████████████████████████████████████████

██████████████████ *See id.*, Exs. 45-46.

      While DaVita hedged in its response that it could not guarantee the

████████████████████████████████████████████████████

██████████████████████████████████ it admitted ████████████████

████████████████████████████████████████ . *Id.*, Ex. 45.

DaVita never supplemented or amended this spreadsheet. Moreover, DaVita's

corporate representative relied heavily on t███████████████████████████

████████████████████████████████████████████████████

███████████████████████████████████████████████

██████ . *Id.*, Ex. 41 at 242:18-247:19. DaVita has not produced ████████████████

████████████████████████████████████████████

████████ in response to Florida Blue's Interrogatory No. 12.

DaVita never informed Florida Blue that it had ██████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████ .

*Id.*, Ex. 2 at 220:13-221:22; Ex. 41 at 251:14-20. Moreover, DaVita's corporate

representative was not aware of the basis on which ████████████████████

████████████████████████████████████████████████████

████████ . *Id.*, Ex. 41 at 244:21-247:19. There is no suggestion in the record that,

████████████████████████████████████ , DaVita found

"demonstrated hardship . . . following a documented process to collect applicable

deductibles, coinsurance and copayments." *Id.*, Ex. 1 at 154.

**F. Florida Blue paid $108 million in claims for the treatment of the ████ individuals DaVita steered into Florida Blue plans, receiving only $13 million in premium payments for those members.**

For the injury suffered as a result of DaVita's conduct, Florida Blue claims that the sum of the amounts paid out on claims to DaVita and other non-dialysis providers for the universe of impacted Florida Blue members following the first date on which DaVita used AKF to pay members' commercial plan premiums is the appropriate measure of damages. *Id.*, Ex. 47. Florida Blue's damages expert, Kevin Cornish, quantified the sum of this injury to be $95,023,922, which is the sum of commercial plan payments made to DaVita in claims paid by Florida Blue with dates of service from January 1, 2014 to May 14, 2019 for the ███████████ DaVita has identified as having received premium payments through AKF in discovery net of the associated premium payments DaVita paid (through AKF) for those members. *Id.*, Exs. 47-48; Ex. 49 at 8:22-9:19.

Mr. Cornish developed his analysis through four datasets: (1) a spreadsheet produced by DaVita that ███████████████████████████████ ████████████████████████████████████; (2) a spreadsheet produced by AKF that ████████████████████████ ██████████████████████████; (3) claims data from Florida Blue for █████████████████████████████ ████ that identified the claims submitted, the dates of service, the amounts paid by Florida Blue, and the out-of-pocket responsibility of the patient; and (4) spreadsheets produced by Florida Blue for █████████████████████████████ ██████████████ that identified the dates of any premium payments made and the



amounts of each premium payment. *See id.,* Exs. 47-48. Using these data sets,

Mr. Cornish determined that there were ███████████████ that had claims

paid by Florida Blue on or after January 1, 2014 during the particular months in

which DaVita paid the members' premiums. *Id.* This subset of patients included

████████████████████████████████████████████████████

████████████████████████████████████████████. *Id.*

He was then able to calculate the amounts Florida Blue paid to DaVita and other

non-dialysis providers for services provided to the ████████ enrolled in employer

sponsored benefit plans or individual exchange benefit plans insured or administered

by Florida Blue during months in which the member's premiums were purportedly

paid by DaVita, as well as the associated premium payments DaVita funded. *Id.*

## LEGAL STANDARD

Summary judgment is proper if "there is no genuine dispute as to any material

fact[.]" Fed. R. Civ. P. 56(a). Once the movant has met its burden to show the

absence of a dispute as to any material fact, the burden shifts to the non-movant to

provide evidence showing a genuine issue of material fact. *Bailey v. Allgas, Inc.*, 284

F.3d 1237, 1243 (11th Cir. 2002). The non-movant "must do more than simply show

that there is some metaphysical doubt as to material facts." *Matsushita Elec. Indus.*

*Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986); *see also Anderson v. Liberty*

*Lobby, Inc.*, 477 U.S. 242, 247-48 (1986) ("[T]he mere existence of some alleged

factual dispute between the parties will not defeat an otherwise properly supported

motion . . .; the requirement is that there be no *genuine* issue of *material* fact"
(emphasis in original)). If the record, taken as a whole, cannot lead a trier of fact to
find for the non-movant, then summary judgment is proper. *Matsushita Elec. Indus.
Co.*, 475 U.S. at 587.

## ARGUMENT

### I.   Florida Blue is entitled to summary judgment on its breach of contract claim.

DaVita contracted with Florida Blue to provide dialysis services to Florida
Blue's members, subject to the terms contained in the parties' Agreement. DaVita's
internal documents show that DaVita ███████████████████████████████████
████████████████████████████████████████████████████████████.
This purposeful act violated the provision in Schedule A stating that DaVita "shall
not waive, discount or rebate any such deductible, coinsurance, and/or copayment
amounts without the prior written consent of [Florida Blue] except for demonstrated
hardship and following a documented process to collect applicable deductibles,
coinsurance and copayments." Gleason Decl., Ex. 1 at 154.

Moreover, DaVita breached section 2.1.1.2 of the Agreement, requiring
DaVita "to render [s]ervices in compliance with all [l]aws," by violating Florida laws
that prohibit offering financial incentives to patients. *Id.* at 101. Specifically, DaVita's
conduct violated three Florida laws: (1) Florida's Anti-Kickback Statute (Fla. Stat.
§ 456.054 et seq.); (2) Florida's Patient Brokering Act (Fla. Stat. § 817.505 et seq.,);
and (3) Florida's Deceptive and Unfair Trade Practices Act ("FDUTPA") (Fla. Stat.

19

§ 501.201 et seq.) (*see* infra § III). Florida Blue is thus entitled to summary judgment on its breach of contract claim.

Under Florida law, a breach of contract claim has three elements: "(1) the existence of a contract, (2) a breach of the contract, and (3) damages resulting from the breach." *Rollins, Inc. v. Butland*, 951 So. 2d 860, 876 (Fla. 2d DCA 2006). "In addition, in order to maintain an action for breach of contract, a claimant must also prove performance of its obligations under the contract or a legal excuse for its nonperformance." *Id.* (citing *Old Republic Ins. Co. v. Von Onweller Constr. Co.*, 239 So. 2d 503, 505 (Fla. 2d DCA 1970)). The undisputed facts described above demonstrate that each of these elements is satisfied.

***First***, there is no dispute that DaVita and Florida Blue had a valid enforceable contract (the Provider Agreement, including its attachments and schedules). *See* Gleason Decl., Ex. 1.

***Second***, there is no dispute that DaVita breached both Schedule A and section 2.1.1.2 of the Agreement through its routine waiver of Florida Blue members' deductibles, coinsurance, and copayment requirements, and remuneration of premium payments in furtherance of its scheme.

### 1. DaVita breached Schedule A of the Agreement.

Schedule A of the Agreement stated DaVita "shall not waive, discount or rebate any such deductible, coinsurance, and/or copayment amounts without the prior written consent of [Florida Blue] except for demonstrated hardship and following a documented process to collect applicable deductibles, coinsurance and

copayments." Gleason Decl., Ex. 1 at 154. The undisputed facts show that DaVita systematically waived ███████ of the cost-sharing obligations of the relevant Florida Blue members. *See id.*, Exs. 45-46.

As discussed above, Florida Blue's Interrogatory No. 12 asked DaVita to identify all instances in which it collected cost-sharing obligations from the relevant Florida Blue members. *See* Statement of Undisputed Material Facts ("SUMF") 15-17. In response, DaVita produced a spreadsheet, which showed that DaVita ██████ ██████████████████████████████████████████████. *See* SUMF 15-17; Gleason Decl., Exs. 45-46. And while DaVita declined to ██████████████████████ ████████████████████████████████████████████████████████████ ███████████████, and has not come forward with evidence showing (or even suggesting) that it collected cost-sharing obligations beyond those listed in the spreadsheet. *See id.*, Ex. 45. In preparation for and at DaVita's Rule 30(b)(6) deposition, DaVita's corporate representative did not ████████████████████ ███████████████████████████████████████████ ████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████ ███████████. *Id.*, Ex. 41 at 243:15-247:19.

The Agreement required DaVita to collect the cost-sharing obligations of Florida Blue members, subject to narrow exceptions. *Id.*, Ex. 1 at 154. DaVita did ████████████████████████████████████████████████████ ████████████████████████████████████████. *See id.*, Ex. 41 at 251:14-20; Ex. 2 at

220:13-221:22. The complete lack of documentary evidence on this subject further demonstrates DaVita's failure to collect cost-sharing obligations. Indeed, nothing in the record suggests that, in ████ of cases, DaVita waived cost-sharing amounts only after "demonstrated hardship and following a documented process to collect applicable deductibles, coinsurance and copayments." *See id.* Nor could a rational trier of fact find otherwise. Moreover, if ████ of patients did in fact have a "demonstrated hardship" that precluded them from paying their cost-sharing obligations, then it is all the more reason that these patients should have never been enrolled in a commercial insurance plan over more cost-effective governmental insurance. DaVita's failure to collect the cost-sharing obligations of the relevant Florida Blue members in ████ of cases merits judgment as a matter of law on DaVita's breach of Schedule A to the Agreement.

2. DaVita breached section 2.1.1.2 of the Agreement by violating the Patient Brokering and Anti-Kickback statutes.

Florida's Patient Brokering Statute prohibits offering or paying any "commission, benefit, bonus, rebate, kickback, or bribe, directly or indirectly in cash or in kind" or engaging "in any split-fee arrangement, in any form whatsoever, to induce the referral of a patient or patronage to or from a health care provider or health care facility." Fla. Stat. § 817.505 et seq. It is also unlawful to "[s]olicit or receive any commission, benefit, bonus, rebate, kickback, bribe, directly or indirectly, in cash or in kind" or engage in any "fee-split arrangement" in return for referring patients to or from a health care provider. *Id.* Relatedly, Florida's Anti-Kickback

Statute makes it "unlawful for any health care provider . . . to offer, pay, solicit, or receive a kickback, directly or indirectly, overtly or covertly, in cash or in kind, for referring or soliciting patients." Fla. Stat. § 456.054. "Kickback" is defined as "remuneration or payment, by or on behalf of a provider of health care services or items, to any person as an incentive or inducement to refer patients for past or future services or items." *Id.*

Here, the "referral" is the opportunity DaVita created to bill Florida Blue through its ███████████████ initiative. DaVita enrolled patients in ███████ ████████████████████████████████████████████████████ ████████████████████████████████████████████████████ ███████. SUMF 10-14. DaVita did this to solicit and obtain the referral of patients, knowing the payments were likely to influence the patients to receive, and continue receiving, dialysis services from DaVita, and to enroll in, or remain enrolled in, commercial insurance plans. *Id.* Indeed, DaVita's support of the premium payment was conditioned on ████████████████████████████████████. This is demonstrated through internal emails between DaVita and AKF in which DaVita ████████████████████████████████████████████████████ ███████████████████████████. SUMF 11-12; Gleason Decl., Ex. 50. Similarly, other emails showed that, ████████████████████████████████ ████████████████████████████████████████████████████ ████████████████████████████████████████████████████ ███████████████████████████████████████████



. SUMF 11-13; Gleason Decl., Ex. 38. Moreover, the ▓▓▓▓

▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓

▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓

▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓

▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓

▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓

▓▓▓▓. SUMF 11-12; Gleason Decl., Ex. 28 at 158:15-160:22.

Relatedly, DaVita's systematic waiver of cost-share was also a kickback. *See* supra § I.1. Those waivers were equivalent to a monetary payment to the patient since the patient would forego the required cost-share obligation. And, as discussed above, those waivers were conditioned on ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓

▓▓▓▓. SUMF 11-12, 14-16.

3.  Florida Blue suffered damages as a result of DaVita's breach.

DaVita's breaches of law and contract caused Florida Blue damages of at least $95 million. SUMF 16-18. Without the payments DaVita made (indirectly) to the members at issue, none would have enrolled in or remained enrolled in a Florida Blue plan. By extension, Florida Blue would not have paid any of the $108 million in claims it paid for services those individuals received. *Id.*

In addition, Florida Blue's payments of claims for services were all conditioned on the member paying his or her cost-sharing responsibilities. Florida Blue would pay nothing unless and until the deductible had been satisfied in a given year. By improperly waiving that deductible, in breach of its contractual obligations,

DaVita caused Florida Blue to pay claims for which nothing was owed (because the deductible had not yet been met).

## II. Florida Blue is entitled to summary judgment on its claim for breach of the implied covenant of good faith and fair dealing.

As discussed above, DaVita's systematic waiver of cost-sharing obligations cannot be squared with the parties' contract. DaVita did not obtain Florida Blue's written consent to waive the cost-sharing obligations of the members at issue, and the record belies any claim that DaVita only waived cost sharing "for demonstrated hardship and following a documented process to collect applicable deductibles, coinsurance and copayments." Gleason Decl., Ex. 1 at 154. Should DaVita nonetheless attempt to argue that it implemented and followed a "demonstrated hardship" process under the contract that resulted in waiving the cost-sharing obligations of Florida Blue members in ▮▮▮▮ of cases, Florida Blue is entitled to summary judgment on its claim for breach of the duty of good faith and fair dealing.

"Florida's implied covenant of good faith and fair dealing is a gap-filling default rule" that "is usually raised when a question is not resolved by the terms of the contract or when one party has the power to make a discretionary decision without defined standards." *Publix Super Mkts., Inc. v. Wilder Corp.*, 876 So. 2d 652, 654 (Fla. 2d DCA 2004). It is "a tool for protecting the reasonable expectations of the contracting parties in light of their express agreement." *Barnes v. Burger King Corp.*, 932 F. Supp. 1420, 1438 (S.D. Fla. 1996). To that end, it "modifies the meaning of all explicit terms in a contract, preventing a breach of those explicit terms

*de facto* when performance is maintained *de jure*." *Alan's of Atlanta, Inc. v. Minolta Corp.*, 903 F.2d 1414, 1429 (11th Cir. 1990).

> "Under an agreement that appears by word or silence to invest one party with a degree of discretion in performance sufficient to deprive another party of a substantial proportion of the agreement's value, the parties' intent to be bound by an enforceable contract raises an implied obligation of good faith to observe reasonable limits in exercising that discretion, consistent with the parties' purpose or purposes in contracting."

*Cox v. CSX Intermodal, Inc.*, 732 So. 2d 1092, 1097 (Fla. 1st DCA 1999) (quoting *Centronics v. Genicom Corp.*, 132 N.H. 133, 562 A.2d 187, 193 (N.H. 1989)).

The unambiguous intent of the parties' contract is that the waiver of cost-sharing obligations be the exception rather than the rule. Its language demands that DaVita "*shall not* waive, discount or rebate any such deductible, coinsurance, and/or copayment amounts" without permission, "*except*" in instances of "demonstrated hardship," and even then only after "following a documented process to collect applicable deductibles, coinsurance and copayments." Gleason Decl., Ex. 1 at 154. If DaVita adopted policies resulting in the waiver of cost-sharing obligations in ███████ ████████████, DaVita's policies inverted the unambiguous intent of this provision and made the exception the rule—a wholly unreasonable application of the contract. By any measure, perfunctory policies addressing billing or attempts to collect cost-sharing obligations by DaVita cannot save them. Policies resulting in a ██████ rate of waiver do not constitute "good faith [in] observ[ing] reasonable limits in exercising" the "discretion" granted DaVita under the Agreement, "consistent

26

with the parties' purpose or purposes in contracting.'" *Cox*, 732 So. 2d at 1097

(quoting *Centronics*, 562 A.2d at 193).

### III. Florida Blue is entitled to summary judgment on its tortious interference with contract claim.

As discussed above, DaVita directed Florida Blue members to AKF, used

AKF to covertly pay their insurance premiums, and further systematically waived

payment of their deductibles and coinsurance amounts for dialysis treatment. Florida

Blue's insurance contracts required the members at issue to pay those amounts

themselves. DaVita knew as much (or had reason to know), but deliberately

subverted those contract terms for its own financial benefit. As a result, Florida Blue

paid amounts it would not otherwise have paid for the treatment of these members.

Under Florida law, tortious interference with contract requires "a contract

exist; the third-party has knowledge of the contract; the third party intentionally

interferes with a party's rights under the contract; there is no justification or privilege

for the interference; and there are damages." *Mariscotti v. Merco Grp. at Akoya, Inc.*,

917 So. 2d 890, 892 (Fla. 3d DCA 2005). Each element is satisfied here.

*First,* there is no dispute that Florida Blue had contracts with the Florida Blue

members at issue here. SUMF 5-7. These contracts included provisions (1) requiring

the members to pay their own insurance premiums; and (2) requiring the members to

pay their own cost-sharing obligations for dialysis treatments. *Id.*

*Second,* DaVita indisputably had knowledge of the contracts between Florida

Blue and the members at issue by virtue of its submission of claims to Florida Blue

for those members' treatment. SUMF 16-18. Moreover, DaVita knew of, or had reason to know of, the obligations imposed by these contracts to pay insurance premiums and cost-sharing obligations. SUMF 14-16. A defendant need not know the specific terms of the contract at issue to be liable. *See Morrow v. Putnal*, No. 3:06-cv-543-J-33TEM, 2007 WL 1875879, at *3 (M.D. Fla. June 27, 2007). And the relevant features of the insurance plans at issue here are standard throughout the insurance industry. *See, e.g., Cincinnati Ins. Co. v. Gilbert*, No. 19-cv-00245, 2019 WL 2514938, at *5 (N.D. Ala. June 18, 2019) ("To deal with the moral hazard phenomenon, in most insurance transactions the insured retains some responsibility for the risk through either a *deductible* or *coinsurance*.") (internal citations omitted).

Moreover, educating and counseling patients on their insurance options required DaVita to have at least basic knowledge of ███████████████ ███████████████████████████████████████████████ ███████████. Gleason Decl., Ex. 5 at 41:11-42:12, 43:22-45:19; Ex. 6 at 47:5-48:16; Ex. 16 at 48:19-50:19; 111:17-112:6, 138:13-20. And Defendants understood that patients were required to pay ███████████████████████████ ███████████████████████████████. *See id.*, Ex. 4 at 47:22-25; Ex. 5 at 44:3-8; Ex. 6 at 47:11-20; Ex. 41 at 248:21-25. Even more, Defendants acknowledged Florida Blue's plans ██████████████████████ ████████. *Id.*, Exs. 39; 24.

**Third,** there is no dispute that DaVita intentionally interfered with Florida Blue's contracts with members. A showing of intentional interference does not

28

require "actual ill-will or fraud . . . where the record shows a purposeful interference with a prior contract right." *McDonald v. McGowan*, 402 So. 2d 1197, 1201 (Fla. 5th DCA 1981). Here, DaVita interfered with these contracts by: (1) encouraging and facilitating members' use of third-party premium payments from AKF, thus putting them in breach of plan provisions that require them to pay their own premiums; and (2) systematically waiving members' cost-sharing obligations associated with dialysis treatment, putting them in breach of plan provisions that require them to pay their cost-sharing obligations. *See* SUMF 10-16; Gleason Decl., Exs. 45-46.

*Fourth,* there was no justification or privilege for DaVita's interference. Although commonly listed as an element of a claim for tortious interference, Florida courts consider justification or privilege to interfere as an affirmative defense for claims of tortious interference with contractual relationships. *See Special Purpose Accts. Receivable Co-op Corp. v. Prime One Cap. Co.*, 125 F. Supp. 2d 1093, 1104 (S.D. Fla. 2000) (citing *Abele v. Sawyer*, 750 So. 2d 70, 75 (Fla. 4th DCA 1999)). DaVita has not pled privilege as an affirmative defense. *See* ECF No. 32. Even if DaVita did have such an interest, its interference took the improper form of deceiving Florida Blue, both with respect to DaVita's relationship with AKF, and with respect to DaVita's collection of cost-sharing amounts.

Finally, there is no dispute that Florida Blue incurred damages as a result of DaVita's tortious interference. *See supra* § I.3.

## IV. Florida Blue is entitled to summary judgment on its Florida Deceptive and Unfair Trade Practices Act claim.

A FDUTPA claim requires "(1) a deceptive act or unfair practice; (2) causation; and (3) actual damages." *See State Farm Mut. Auto. Ins. Co. v. Med. Serv. Ctr. of Fla., Inc.*, 103 F. Supp. 3d 1349, 1354 (S.D. Fla. 2015). "A deceptive practice is one that is 'likely to mislead.'" *Kertesz v. Net Transactions, Ltd.*, 635 F. Supp. 2d 1339, 1348 (S.D. Fla. 2009) (quoting *Davis v. Powertel, Inc.*, 776 So. 2d 971, 974 (Fla. 1st DCA 2000)); *see also Zlotnick v. Premier Sales Group,* 480 F.3d 1281, 1284 (11th Cir. 2007) (deception occurs if there is a "representation, omission, or practice that is likely to mislead the consumer acting reasonably in the circumstances, to the consumer's detriment") (internal citations omitted).

For deceptive acts, "FDUTPA does not require a plaintiff to prove actual reliance on the alleged conduct," but "the plaintiff must prove that 'the alleged practice was likely to deceive a consumer acting reasonably in the same circumstances.'" *Cold Stone Creamery, Inc. v. Lenora Foods I, LLC*, 332 F. App'x 565, 567 (11th Cir. 2009). "A practice is unfair under the FDUTPA if it offends established public policy, is immoral, unethical, oppressive, unscrupulous, or substantially injurious to consumers." *True Title, Inc. v. Blanchard*, No. 6:06-cv-1871-Orl-19DAB, 2007 WL 430659, at *3 (M.D. Fla. Feb. 5, 2007). Courts have held that "the statute should be construed liberally" such that the "unfair and deceptive" language "should be regarded as 'extremely broad.'" *Citibank (South Dakota) N.A. v. Nat'l Arbitration Council, Inc.*, Nos. 3:04-cv-1076-J-32MCR, 3:04-cv-1205-J-20MCR, 2006 WL 2691528, at *3 (M.D. Fla. Sept. 19, 2006) (citations omitted). A party may

show either a traditional or per se violation to satisfy the first element of a FDUTPA claim.

### 1.   DaVita's scheme constitutes a per se FDUTPA violation.

A per se violation may be based on "[a]ny law, statute, rule, regulation, or ordinance which proscribes unfair methods of competition, or unfair, deceptive, or unconscionable acts or practices." Fla. Stat. § 501.203(3)(c). Specifically, DaVita violated (1) Fla. Stat. § 456.054 – which prohibits provider kickbacks; and (2) at least two subsections of Fla. Stat. § 817.505 et seq. – which prohibits patient brokering. Each of these statutes operates as a FDUTPA predicate. A court in the Eleventh Circuit has recognized that per se FDUTPA claims can be based on alleged violations of these statutes. *State Farm Mut. Auto. Ins. Co. v. Performance Orthapaedics & Neurosurgery, LLC,* 315 F. Supp. 3d 1291, 1300 (S.D. Fla. 2018) (finding both statutes "serve as predicate statutes for [a] FDUTPA claim" as a matter of law). The Florida Patient Brokering Statute and Florida Anti-Kickback Statute prohibit the precise type of conduct that FDUTPA is designed to prevent: paying bribes, kickbacks, and other forms of prohibited remuneration to obtain business is a form of unfair and deceptive competition. These statutes explicitly prohibit a provider, like DaVita, from billing charges when the provider does not intend to collect the member's share of such charges and from transmitting illegal inducements for referrals under the guise of a charitable donation. *See* supra § I; Fla. Stat. § 456.054; Fla. Stat. § 817.505. DaVita violated these statutes by systematically waiving or otherwise not intending to collect the patient responsibility portion of their charges. *Id.* DaVita also violated these

statutes by paying patients (through an intermediary, AKF) in exchange for the opportunity to bill Florida Blue. *See* SUMF 10-17. These unlawful acts and practices affected many claims for services rendered in Florida and caused significant economic harm to Florida Blue because they caused Florida Blue to make substantial payments to DaVita that Florida Blue was not obligated to make. SUMF 17-18. Therefore, Florida Blue satisfied the first and second elements of a FDUTPA claim.

   2.   DaVita's scheme constitutes a traditional FDUTPA violation.

   To establish a traditional FDUTPA violation, the plaintiff must show defendants engaged in "[u]nfair methods of competition, unconscionable acts or practices, and unfair or deceptive acts or practices in the conduct of any trade or commerce." Fla. Stat. § 501.204(1). To determine whether an act is deceptive or unfair, Florida law employs an objective test: whether "the alleged practice was likely to deceive a consumer acting reasonably in the same circumstances," rather than "actual reliance on the representation or omission at issue." *Vazquez v. Gen. Motors, LLC*, 17-22209-CIV, 2018 WL 447644, at *6 (S.D. Fla. Jan. 16, 2018) (internal quotations and citations omitted). Under FDUTPA, "trade or commerce" includes the "providing" of "any . . . service," including healthcare services such as dialysis treatments. *See* Fla. Stat. § 501.203(8). Billing for medical services also constitutes trade or commerce. *See James D. Hinson Elec. Contracting Co., Inc. v. BellSouth Telecomm., Inc.*, 642 F. Supp. 2d 1318 (M.D. Fla. 2009) (finding "bill" sent by utility to excavator was in "trade and commerce," as required for claim under FDUTPA).

It is undisputed that DaVita engaged in a wide range of deceptive acts and unfair practices, including: (a) illegally waiving or failing to collect cost-sharing obligations from Florida Blue plan members; (b) illegally and deceptively funneling money through AKF to Florida Blue plan members; (c) using the aforementioned forms of remuneration plus misleading, deceptive, and unethical "counseling" to "steer" vulnerable patients onto Florida Blue's plans for purposes of DaVita's own financial gain, and (d) billing Florida Blue for services rendered to these patients while misrepresenting and failing to disclose material information about the lawfulness of the services and the means DaVita employed to steer the patients onto Florida Blue's plans. SUMF 10-18; Gleason Decl., Exs. 45-46.

DaVita knew that it was prohibited from paying its patients to do anything— particularly to induce the patient to create billing opportunities for DaVita. So DaVita attempted to disguise the fact that it was doing just that. Telling the public that it was merely "donating" to a disinterested "charity," in fact, DaVita was paying AKF a ███████████ to launder DaVita's money. DaVita and AKF carefully coordinated the amount ████████████████████████████████████████ ████████████████████████████████████████ ██████████████████. SUMF 10-14. When DaVita feared that █████████████ ████████████████████, DaVita arranged for those payments to be even further concealed—██████████████████. *See* Gleason Decl., Ex. 33.

In addition, DaVita made additional payments to its patients by waiving or otherwise eliminating patients' deductibles, coinsurance, and other cost-sharing

obligations. SUMF 14-16. Of course, these financial obligations were a creature of DaVita's making—by ███████████████████████████████████████ ██████████████████ indigent patients who would otherwise have owed nothing in furtherance of their care to assume thousands of dollars in cost-share. Such behavior is deceptive as it plainly misrepresents and withholds material information in connection with the claims submitted by DaVita and ultimately, paid by Florida Blue. *See State Farm Mut. Auto. Ins. Co. v. Health & Wellness Servs., Inc.*, 446 F. Supp. 3d 1032, 1052-55 (S.D. Fla. 2020), appeal filed (No. 20-13394) (finding that making misrepresentations in invoices, including those submitted in connection with the provision of medical services, and failing to collect cost-sharing obligations constitutes the kind of "unfair or deceptive acts or practices" that can support summary judgment on a traditional FDUTPA claim). Such behavior is also unfair as it is "substantially injurious" not only to Florida Blue but to the patients who are merely pawns, targeted by DaVita's self-serving "education" tactics and at risk of paying higher out-of-pocket costs in order to maximize DaVita's revenues and profits. SUMF 7-10. DaVita's systematic and serial use of misrepresentations and false statements in claims for dialysis services rendered to Florida Blue members qualifies as a deceptive act or unfair practice under traditional FDUTPA framework.

DaVita cannot submit evidence to the contrary or create any genuine dispute of material fact about whether its conduct caused a traditional FDUTPA violation. Florida Blue is therefore entitled to summary judgment as to its FDUTPA claims.

3.  DaVita caused Florida Blue damages.

There is no dispute as to the elements of causation or damages. Florida Blue has been injured directly as a consequence of DaVita's unfair or deceptive practices in the course of paying for dialysis services on behalf of its members that DaVita rendered unlawfully. There are two ways to measure damages in a FDUTPA claim: (1) the value between what was promised and what was delivered; or (2) the total price paid for a valueless good or service. *HRCC, Ltd. v. Hard Rock Cafe Int'l (USA), Inc.*, 302 F. Supp. 3d 1319, 1323 (M.D. Fla. 2016), aff'd, 703 F. App'x 814 (11th Cir. 2017). It is undisputed that Florida Blue paid DaVita as a result of claims made by DaVita for payment of dialysis services. Accordingly, the Court should grant summary judgment in Florida Blue's favor.

Florida Blue is also entitled to recoup the total amount paid because the services rendered were fraudulent, and unauthorized, and therefore, had no value. Florida Blue is entitled to recover the amounts for benefits paid on the unlawful and deceptive claims DaVita submitted to it (the actual damages), plus attorneys' fees, costs, and interest. *See* Fla. Stat. § 501.211. Florida Blue is also entitled to declaratory judgment declaring DaVita's acts and practices as unfair and deceptive in violation of FDUTPA, an order enjoining DaVita from continuing to engage in such unfair and deceptive acts and practices, and any other relief the Court deems just and proper. *Id.*

## CONCLUSION

For the foregoing reasons, Florida Blue respectfully requests that this Court grant its Motion for Partial Summary Judgment.

DATED: January 14, 2022

Respectfully submitted,

By: */s/ Jeffrey S. Gleason*
Jeffrey S. Gleason (MN. Bar #396190)
Anne M. Lockner (MN. Bar #295516)
Jamie R. Kurtz (MN. Bar #391792)
ROBINS KAPLAN LLP
800 LaSalle Plaza,
2800 LaSalle Avenue
Minneapolis, MN 55402-2015
T: (612) 349-8500
*jgleason@robinskaplan.com*
*alockner@robinskaplan.com*
*jkurtz@robinskaplan.com*

Michael A. Abel, Esq.
Florida Bar No. 0075078
Jared J. Burns, Esq.
Florida Bar No. 1003415
ABEL BEAN LAW, P.A.
100 North Laura Street, Suite 501
Jacksonville, Florida 32202
Telephone: (904) 944-4100
*mabel@abelbeanlaw.com*
*jburns@abelbeanlaw.com*

*Trial Counsel for Plaintiffs*

36

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that a true and correct copy of the foregoing was filed on

January 14, 2022 with the Court's electronic filing system which will send notice of

filing to all counsel of record.

By: */s/ Jared J. Burns*
Jared J. Burns